McGILL MANUFACTURING COMPANY, INC. *v.* DODD

[No. 17,327.   Filed March 20, 1945.   Rehearing Denied May 1, 1945.   Transfer Denied June 18, 1945.]

*Oscar C. Strom,* of Gary, for appellant.

*Edward J. Ryan,* of Valparaiso, *John F. Watkins,* of Indianapolis, and *Frank S. Pryor,* of Frankfort, for appellee.

DOWELL, P. J.—This cause reaches us on appeal from an award of the full Industrial Board of Indiana made pursuant to § 40-2220, Burns' 1933, the same being § 20 of the Indiana Workman's Occupational Diseases Act.

As against the action of the Board, awarding compensation to appellee for disability resulting from an occupational disease, appellant asserts error as follows:

"1. The findings and award of the Industrial Board of Indiana are contrary to law.

"2. The Industrial Board of Indiana erred in refusing the offer of the defendant to prove that the alleged Occupational Disease for which the plaintiff was awarded compensation was not incidental to the character of the business of the defendant and did not have its origin in a risk connected with the employment and that the same had no direct causal connection and was not a result of any exposure occasioned by the nature of the employment."

Appellant's second assignment may be disposed of by the observation that the record makes it apparent that appellant's offers to prove, though made at the original hearing, were not renewed at the hearing before the full board. No question, therefore, is presented here. *Hayes* v. *Joseph E. Seagram & Co.* (1944), 222 Ind. 130, 52 N. E. (2d) 356.

The first assignment requires us to examine the evidence, by which it appears that appellee was in the employ of appellant on the 13th day of March, 1943, at an average weekly wage of $48.88, having begun work for appellant on November 8, 1940, as a race grinder and being transferred 5½ months later to a job as bore grinder. The bore grinding machine operated by appellee was 5½ feet high and in the manipulation thereof appellee, who is 5 feet 11 inches in height, placed the bearing to be ground in the machine, pushed a lever on the left side thereof and held same in position until the grinding process was completed. Appellee performed from 55 to 65 of these operations each hour for periods varying from 8 to 12 hours per day from April 20, 1941, until March 12, 1943. During his operation of the

machine appellee, because of his height, was compelled to stoop slightly in order to look into the machine, remaining in this position almost constantly during his day's work, turning his head to the right, then to the left. In February, 1943, appellee visited a physician to obtain relief from what he described as a tightness in the muscles of the neck and was informed that he had an "occupational neurosis—different from neuritis." Shortly thereafter appellee's muscles tightened further, pulling his head around toward his right shoulder. His condition was then diagnosed as spastica torticollis, commonly known as wryneck. Appellee's disability resulting from this condition began March 20, 1943, and continued until October 11, 1943, when he recovered and began work for the same employer on a different type of machine where he still is employed.

The only medical testimony in the record is that of appellee's physician who, though testifying that in his opinion appellee's condition was caused by his work, described it as a "neurosis."

Neurosis has been defined as: "A functional nervous disorder without demonstrable physical lesion." Webster's New International Dictionary, 2d Ed. 1942; and as: "A change in the nervous system of the individual that produces symptoms, but in which on examination of the nerve organs after death, at an autopsy for instance, no physical symptoms could be found." 45 C. J. 1930; *Star Publishing Co.* v. *Jackson* (1944), 115 Ind. App. 221, 58 N. E. (2d) 202.

The physician's further testimony in the instant case coincides with the opinions of other eminent medical authorities as expressed in books on the subject and as set out in the case of *Star Publishing Co.* v. *Jackson, supra,* p. 223, and in the further respect that a neurosis is an ailment to which the general

public is exposed outside the employment engaged in by the appellee and one which often is referred to a psychiatrist for alleviation, since it may arise out of worry, failure of the patient to adjust himself socially, overwork, any ordeal, or other causes which cannot be discovered by a physician, such as secret and hidden worry of the patient.

While in the instant case objective symptoms were present the evidence that they resulted from neurosis was positive and undisputed, appellee's physician further testifying that the services of a psychiatrist would have been good for appellee, had such services been available.

In the light of such testimony rationality can be strained to the breaking point without avail in the effort to sustain the proposition that appellee's disease was incidental to the character of the business in which he was employed.

While not denying that, under the rules governing the review of causes appealed from the Industrial Board, the evidence in the instant case, though conflicting, is sufficient to sustain a finding that there existed some causal connection between appellee's disease and the work performed by him we cannot hold it probative of a finding that appellee was suffering from an occupational disease as defined by Acts 1937, ch. 69, p. 334, § 6, § 40-2206, Burns' 1940 Replacement.

The Indiana Workmen's Occupational Disease Act is a humane enactment designed and intended for the protection of workmen who come within its provisions, which are and ought to be liberally construed and applied, so as to extend that protection to the ultimate good of the greatest possible number of our workers; but the extent and limitation of its applicability also are fixed by those provisions and we

cannot, by judicial pronouncement, enlarge these beyond the very obvious intent of the legislature which was, not to provide general health insurance to the workman, but to compensate him for disability resulting only from a disease incidental to the character of the business in which he is employed and having its origin in a risk connected with the employment, and to exclude from the protection of the Act workmen suffering from diseases arising out of a hazard to which workmen would have been equally exposed outside their employment and independent of the relation of employer and employee.

Indulging all liberality we cannot perceive in the Act a legislative intent and purpose to extend its protection to those workmen who suffer, unfortunately, from outward manifestations and symptoms of many possible vagaries and aberrations of the human mind which, though having some causal connection with an employment, are, nevertheless, ills all human flesh is heir to; unless, in such cases, the causative inducing the mental condition be an intervening occupational disease, as defined by the Act, of which there is no evidence in the instant case.

Reversed.

Royse, J. Dissents with opinion in which Hamilton, J. Concurs.

NOTE.—Reported in 59 N. E. (2d) 899.

## DISSENTING OPINION

ROYSE, J.—I am unable to agree with the majority opinion in this case. I feel their opinion places a narrow construction on the beneficient purposes of the Indiana Workmen's Occupational Disease Act not intended by the Legislature. (Hereinafter this Act will be referred to as the Occupational Disease Act).

Section 6 of the Act here under consideration (§ 40-2206, Burns' 1940 Replacement) defines the term "Occupational disease," as follows:

"(a) As used in this act, the term 'occupational disease' means a disease arising out of and in the course of the employment. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where such diseases follow as an incident of an occupational disease as defined in this section.

"(b) A disease shall be deemed to arise out of the employment, only if there is apparent to the rational mind, upon consideration of all of the circumstances, a direct causal connection between the conditions under which the work is performed and the occupational disease, and which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment and which can be fairly traced to the employment as the proximate cause, and which does not come from a hazard to which workmen would have been equally exposed outside of the employment. *The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not have been foreseen or expected but after its contraction it must have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence.*"

It will be noted that Subd. (a) defines "occupational disease" as one "arising out of and in the course of the employment." It then excludes ordinary diseases to which the general public is exposed outside the employment "*except* where such diseases follow as *an incident of an occupational disease as defined in this section.*" (My emphasis.) The word "incident" means "appertaining to or depending on." Webster's New International Dictionary, 3rd definition. I construe this subdivision to mean that where an ordinary disease of life is contracted as a result of conditions appertaining to or de-

pending on the employment which arose out of and in the course of the employment, there is a compensable occupational disease.

Subd. (b) provides the conditions under which a disease shall be deemed to arise out of the employment. I construe the first sentence of this subdivision to mean that an occupational disease arises out of the employment where there is a direct connection between its cause and the conditions under which the work is performed, which reasonably may be determined to have followed as a normal result of the exposure occasioned by the work pertaining to the employment and which may be traced to such employment as a proximate cause of the disease, provided, of course, it does not arise from a hazard to which there is an *equal* exposure outside the employment. The disease must be incidental (viz. liable to happen or follow as a chance, feature or incident) to the character of the business and not caused by something independent of the relation of employer and employee. It need not have been foreseen but must have had its origin in a risk connected with the employment and resulted from such source as a reasonable consequence thereof.

Upon the foregoing construction of this statute I proceed to a consideration of the facts in the instant case to determine whether the appellee has brought himself within the class for whom the statute provides compensation. In considering these facts I take it that cases brought under this statute are no exception to the well-established general rule that where there is any substantial evidence to sustain the award of the Industrial Board this court has no authority to reverse such award. I further understand that in considering the facts in this case this court should only consider that evidence which is most favorable to the appellee.

In my opinion the majority has not followed the foregoing rules in considering the evidence in this case. In their opinion it is stated appellee's physician described appellee's condition as a "neurosis." While it is true the record discloses this physician on cross-examination said the condition of appellee was described as a "neurosis," yet in the same cross-examination said it could be brought on by conditions other than a disarrangement of the nerves, such as over-work. As pointed out in the majority opinion, appellee's condition was diagnosed as "Spastic Torticollis." Stedman's Medical Dictionary, 12th ed., gives the following definition of those words:

> "Spastic — Spasmodic condition; — (a) local anemia from spasmodic vasoconstriction—(b) hemiplegia—partial hemiplegia with increased reflexes and spasmodic contraction of the muscles on attempted movement—(c) paralysis—partial paralysis with muscular rigidity."
>
> "Torticollis — from Latin *Tortus* meaning twisted; *Collum* meaning neck. Wry-neck, stiff-neck, caput obstipum, a spasmodic contraction of the muscles of the neck, chiefly those supplied by the spinal accessory nerve; the head is drawn to one side and usually rotated so that the chin points to the other side."

The record in this case discloses several pertinent items of testimony which I deem favorable to appellee which were not set out in appellant's brief nor referred to in the majority opinion. For example, appellee's doctor said the condition in which he found appellee was that he was suffering from a contraction of the muscles of the neck and a drawing of the head to the right; that this condition was objectively shown. In Stedman's Medical Dictionary, *supra,* a "Contraction" is described as follows:

> "Contraction—A shortening, noting the normal function of muscular tissue—(a) A more or less

permanent shortening of a muscle. (b) A shrinkage or reduction in size."

Other pertinent evidence in the record not found in appellant's brief is to the effect that this doctor could find no other hypothesis than that of his work which would have caused his condition. A psycho-neurotic condition may be brought on by the machine which appellee operated. Appellee's neck was definitely drawn to the right. He could strain it back but it would again draw back to the right. The number of movements made to the right and left by appellee is very material as to the cause of his condition. In the opinion of this doctor the constancy of his work brought appellee's condition to a climax. He stated appellee's condition was caused by his work.

The majority opinion quotes Webster's New International Dictionary and 45 C. J. 1930 in defining the term "Neurosis." These definitions were quoted in the recent case of *Star Publishing Company* v. *Jackson* (1944), 115 Ind. App. 221, 58 N. E. (2d) 202. As a general statement, these definitions are not subject to criticism. However, there are many forms and kinds of neurosis, among which are traumatic, alcoholic, emotional, occupational, professional, reflex, vasomotor and Westphal's. Stedman's Medical Dictionary, *supra*.

It is admitted in the majority opinion there is sufficient evidence to sustain a finding that there was a causal connection between appellee's disease and the work performed, but it is asserted there is no probative evidence that appellee was suffering from an occupational disease as defined by the statute, § 40-2206, *supra*, and cites as authority for this statement the case of *Star Publishing Company* v. *Jackson*, *supra*. In my opinion the decision in that case cannot be an authority for the decision in this case because the facts there are clearly

distinguishable from those in the case at bar. In the Jackson case, *supra,* Judge Draper, speaking for this court, stated the fact upon which our decision was made, as follows:

"The medical testimony indicated without dispute that plaintiff was in excellent health. No organic disease, *muscle atrophy, sensory loss or impairment of reflexes or sensibilities* could be discovered. *His skull, spine, vital organs, blood pressure and pulse* were normal and there was no weakness of the *muscles* of the left upper extremity. The tendons, nerves and arteries of the upper left arm were objectively intact and normal. The appellee was exhaustively examined in many other respects, but the objective examination was entirely negative. All medical witnesses agreed that plaintiff was suffering from a neurosis, and that the condition was not peculiar to any particular occupation. In only one respect did the experts disagree. The plaintiff's physician, who had not in his examination of the plaintiff explored the possibilities of a mental difficulty, testified: 'I would attribute it (such neurosis) to chronic fatigue of the nerve centers controlling the muscles of the upper left extremity, particularly those controlling the movement of the hand and digits which make the movements necessary to the operation of the linotype machine.' The others attributed it solely to a condition of the appellee's mind that had arisen out of a disagreement between him and his foreman, with consequent unpleasantness existing between them for a period of ten years, the appellee feeling that the foreman had discriminated against him, had been unkind toward him, had denied him well deserved vacations and twice attempted to have him discharged." (My emphasis.)

In the instant case the record discloses there was a tightening and contraction of the sternomastoid muscle which pulled the head to the right, which was described as a reflex. The objective examination was positive. There was no evidence that appellee's ailment was due to

a condition of his mind, while there was positive medical evidence to the effect that his condition was directly attributable to the nature and conditions of his employment. The constant turning of appellee's head required by the nature of his work was not a hazard to which appellee would be equally exposed outside of his employment. There is positive evidence this was a material cause of his condition.

It is true in this case, as in the Jackson case, *supra*, that the disease from which appellee suffered is an ordinary disease of life to which the general public is exposed outside of the employment, and it is therefore not compensable *unless* it followed as an incident of an occupational disease as defined by our statute. In passing on this question this court, in the case of *Chevrolet Muncie Division of General Motors Corporation* v. *Hirst* (1943), 113 Ind. App. 181, at p. 189, 46 N. E. (2d) 281, again speaking through Judge Draper, said:

> "Having in mind that our statutes do not provide that ordinary diseases of life to which the general public is exposed outside the employment may not under proper circumstances be compensable, but that such shall be compensable when they follow as an incident of an occupational disease as defined by the statute, . . ."

The effect of the majority opinion in this case is that under no circumstances can a "neurosis" become compensable under the Occupational Disease Act. I do not agree with such a construction of this Act. I believe there was substantial evidence from which the Board could have found that the nature of the work and conditions under which it had to be performed caused a shortening and a tightening of the sternomastoid muscle which drew the head of appellee down and to the right; that if the resulting condition is to be termed a "neu-

rosis" it followed as an incident of a disease which arose out of and in the course of his employment with appellant. I therefore believe the award of the Industrial Board should be affirmed.

Hamilton, J.—Concurs.

NOTE.—Reported in 59 N. E. (2d) 899.