SCHWITZER-CUMMINS COMPANY *v.* HACKER

[No. 18,341. Filed May 6, 1953. Rehearing denied June 12, 1953. Transfer denied September 28, 1953.]

678

*Murray, Mannon, Fairchild & Stewart,* and *James L. Murray,* of Indianapolis, for appellant.

*Howard L. Eads* and *William T. Stoops, Sr.,* of Indianapolis, for appellee.

KELLEY, J. Appellee was an employee of the appellant and on June 23, 1951, filed his application with the Industrial Board upon Industrial Board Form 115 for compensation under the provisions of the Indiana Workmen's Occupational Diseases Act. The full Industrial Board by a majority decision, on May 8, 1952, found for appellee and that on May 15, 1951, the latter was an employee of appellant at an average weekly wage in excess of $45.00; that appellee was on said latter mentioned date operating a milling machine for appellant and "was compelled to inhale different kinds of dust which permeated the air in the room in which plaintiff worked, all of which caused inflammation in plaintiff's lungs and bronchial tubes, resulting in an

occupational disease". The Board further found "that the temporary total disability which plaintiff is now suffering and which he has been suffering since the 15th day of May, 1951, is due to a disease known as bronchiectasis, which was an incident of an occupational disease, which is a direct causal connection between the condition under which the plaintiff performed his work and the disease followed as a natural incident of the work as a result of exposure occasioned by the nature of plaintiff's employment". Award of compensation was made to appellee.

Appellant challenges said finding and award of the Board as being contrary to law and specifies two grounds, viz: (1) that it is not supported by *any evidence,* and (2) it does not rest upon a *substantial factual foundation.* The basis of this challenge is appellant's contention that if the appellee suffers from bronchiectasis, the disease is not an occupational disease within the purview of the Occupational Diseases Act, because it is general to the public and one to which the public is exposed outside of any employment, and, further, that if the breathing of such dust did irritate appellee's lungs "to the extent that an inflammation developed, to which his bronchiectasis was incidental, such inflammation itself was a condition or disease to which the general public, irrespective of any employment, is exposed". Appellant further says ". . . not a scintilla of testimony was presented that either the lung disease or the primary inflammation, if either existed, met with the statutory definition of an occupational disease, since each was by abundant testimony defined as an ordinary disease or condition of life to which the general public is exposed outside of any employment. . . .", and appellant then submits its interpretation of the Occupational Diseases Act to the effect that the disease

must be incidental to the "character of the business" and must not result from a "hazard to which workmen would be exposed outside such employment".

The evidence most favorable to appellee given at the hearing before the full Board, while not as clear, cogent and satisfactory in some respects as might be desired, sufficiently shows by direct evidence and the reasonable inferences permissible therefrom, that the appellee was a man of 36 years of age, in good health and without any previous serious illnesses, other than an appendectomy, and that following a pre-employment examination by appellant's physician, was employed by appellant in December, 1950, as the operator of a milling machine; that on or about March 4, 1951, appellee was assigned to the operation of two large milling machines; these machines were each equipped with two cutting wheels and were used to cut off end portions of cast iron bars weighing variously from 2 to 60 pounds; appellee's position was between the two machines, which were from four to six feet apart, and his work consisted of placing and setting a cast iron bar in one machine and while it was cutting that bar, to pick up, place and set a bar in the second machine and by the time this latter operation was completed; the cutting of the first bar was finished and while the second machine was cutting the second bar the appellee would pick up and place another bar in the first machine, and so on during his entire working time; this work was strenuous and required appellee to be very active and to breath deeply; the cast iron bars were painted prior to the cutting with a paint composed of 94 per cent iron oxide and 6 per cent zinc chromate which was subjected to heat resulting from the cutting process; there was testimony to the effect that heat applied to the paint would cause the zinc chromate to break down into various oxides, one of

which was chromate oxide, which could be very irritating to the lung tissues.

The room in which said milling machines were located housed other machines also, all of which, including appellee's machines, were dry grinders using no wet or oil solutions; these machines were not equipped with blowers; there were two windows overhead which would not stay open, and a stationary fan over the aisle which could not be operated because of objections by other workmen that it made too much draft; there was no ventilation near appellee; as a result of the running of these machines and the cutting of the cast iron, fogs of dust, laden with iron particles constantly filled the working space, collected around the head and person of appellee, settled upon the machines, the floor, and upon and into the tool boxes, and turned the color of appellee's underclothing to a "dark brown".

The appellee had never had colds or lung trouble prior to working for appellant and was told by appellant's examining physician at the pre-employment examination that he was "all right" and that he should "go on to work"; that as a result of working in and breathing the said dust, appellee's eyes became swollen and the eyelids sore; he first noticed "a running nose and headaches", then shortness of breath, dizzy spells, weakness upon exertion, numbness of legs and arms, sleeplessness, sharp pains in the left side of chest, swelling of face, throat, legs and arms, frequent coughing, and sometimes coughing up "rusty material", mucous "real brown" in color and occasionally blood, and spitting up of mucous in quantities as high as "one to one and a half cups every twenty-four hours"; that for a considerable time appellee had difficulty sleeping in a bed but sat propped up with cushions; appellee lost from 25 to 30 pounds in weight; that for two months after quiting work

for appellant, appellee's underclothing and bed sheets "would be stained a dark brown, as iron rust"; that appellee is unable to work in his present condition.

Another employee who worked for appellant on a grinder during the same period as appellee but in another department, became affected with the dust, coughed up quantities of it, and quit his employment with appellant because, as he said, he "found out what it would do for anybody".

Several physicians testified in the case and the general effect of their testimony is that appellee was suffering from a disease known as bronchiectasis and that such is a disease which the general public could develop if the conditions were sufficient; that the appellee was running a temperature, his blood count was 24 per cent below normal, and his heart inclined to function improperly; that the dust breathed by appellee at his work for appellant was contaminated with an irritant and had an irritating effect upon his respiratory tract which was contributed to by exposure to chromate oxides; that appellee had a pulmonary infection, arising out of and in the course of his employment; that the irritation resulting from such contaminated dust in his place of employment was sufficient to and did cause inflammation of appellee's lungs, and that such inflammation is a disease to which the bronchiectasis was incidental; that an operative removal of the diseased area is required for the cure of appellee.

The Indiana Workmen's Occupational Diseases Act was enacted in 1937 and put in force on June 7, 1937. It is found in Acts 1937, ch. 69, Sections 1 to 32 inclusive, and Burns' Indiana Statutes, Anno., 1952 Replacement, Sections 40-2201 to 40-2231, inclusive. It would serve no good purpose to here set forth in full, in haec verba, Section 6 of the Occupa-

tional Diseases Act. Suffice it is to say that said Section 6 of the Act is divided into two clauses or subdivisions. Subd. (a) defines "occupational disease" as one "arising out of and in the course of the employment." It then excludes ordinary diseases to which the general public is exposed outside of the employment *"except"* such as follow as an incident of occupational disease *as in said section defined.* (Our emphasis.) Subd. (b) then delineates the requisites necessary to establish a disease as occupational. A short reference to the antecedent history culminating in the adoption of the Act will serve to shed some light upon the true objects and intents in the passage thereof.

Prior to the enactment of this legislation it was difficult to find coverage of ailments and disease under the Workmen's Compensation Law because of the requirement of establishing definite dates and circumstances to support accident and injury cases; further, where relief for disease disability was sought under the Indiana Employers' Liability Law, many obstacles were encountered to the satisfactory proof of the negligence of the employer. Our courts were constantly buffeted with appealed claims for diseases arising out of the employment where the elements of accidental injury were not present. The efforts of our courts to cope with these unfortunate situations naturally resulted in the appearance of judicial inconsistencies attributable, no doubt, to the ever varying factual situations. See, for examples: *Standard Cabinet Company* v. *Landgrave* (1921), 76 Ind. App. 593, 132 N. E. 661; *Wasmuth-Endicott Company* v. *Karst* (1922), 77 Ind. App. 279, 133 N. E. 609; *Moore* v. *Service Motor Truck Company* (1924), 80 Ind. App. 668, 142 N. E. 19; *Brewer* v. *Veedersburg Paver Company* (1931), 92 Ind. App. 547, 177 N. E. 74; *Buenker*

v. *Union Furniture Company* (1932), 95 Ind. App. 84, 181 N. E. 294; *General Printing Corp.* v. *Umback, Administratrix* (1935), 100 Ind. App. 285, 195 N. E. 281. Small, in his Workmen's Compensation Law of Indiana, page 421, section 13.1, makes this observation:

> "Undoubtedly, the awkwardness of judicial gyrations attempting to make occupational disease compensable, either through the Compensation Act or the Liability Act was in part responsible for the legislation of 1937, finally providing directly for disease compensation."

It seems safe to assume that the legislative mind became cognizant of the circumstances that the slow, creeping, insidious progress of disease often may be more devastating, crippling and lethal to a workman than the disablement resulting from accidental physical injury, and that humane considerations demanded the proffer of an opportunity for compensation to those who contract disease as a result of being compelled to toil for a livelihood in the surroundings and under the conditions furnished by and at the will of an employer wherein may lurk the risks and inherent hazards of disease.

In many ways the appellant, in it's brief, appears to urge upon a limitation of the scope and application of the Act to a few diseases of an *unusual nature* which are natural incidents of employment in a *particular* calling or occupation, and which are from common experience known to be *usual* and *customary incidents to such callings or occupations*. The ultimate result of the acceptance and approval by us of such a premise would be the establishment of the doctrine that the Indiana Occupational Diseases Act should be construed as if the same required the scheduling or specific designation of certain particular dis-

eases as falling within its provisions and that such diseases only would be compensable. If such be appellant's proposal we find ourselves out of harmony therewith.

That such was not the intent or the spirit of the Act is evident from the arrangement and the wording of the Act and the omission therefrom of the scheduling or specific designation of compensable diseases. The Occupational Diseases Act of the various states of the Union have indicated that they are divided into two groups, those adhering to what is commonly designated as the "general" definition and those which have, to a more or less extent, provided a "specific description" or a "scheduling" of diseases to be construed as falling within the terms of the Act. By the provisions of the Indiana Act, she has aligned herself with those states under the "general" definition rules. Other states of present like adherence are: California, Connecticut, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New York, North Dakota, Ohio, Oregon, Washington, and Wisconsin. The "specific description" or "scheduling" states now include Arizona, Arkansas, Colorado, Delaware, Georgia, Idaho, Kentucky, Maine, Maryland, New Jersey, New Mexico, North Carolina, Pennsylvania, Rhode Island, Utah, Virginia, and West Virginia. It is further noted that in the Indiana Act it is provided in Par. (e) of section 5 of the Act (Burns', Section 40-2205, 1952 Replacement) that *in all occupational diseases* except those caused by the inhalation of *silica dust* or *asbestos dust*, no compensation shall be payable unless disablement occurs within one year from last exposure, and for the two excepted diseases within three years from last exposure. Such provision is strongly indicative that the

Act was not intended to be limited to a few specific diseases.

One eminent authority, in speaking of our Occupational Diseases Act, says:

> "The Indiana Workmen's Occupational Diseases Act is a good one so far as its general aims and objects are concerned. *It embraces every true occupational disease,* yet provides standards sufficient to exclude pretenders. However, the act is poorly drafted. . . . Its sentences are grammatically intolerable and its sections are inordinately long, all resulting in confusions and contradictions. * * * The statute's high purpose deserves a better mold than that in which it has been cast. . . ." (Our emphasis). Small's Workmen's Compensation Law of Indiana, pages 421-422, Section 13.1.

Nevertheless, we must accept it as written and, with the assistance of former adjudications thereon, endeavor to ascertain its meaning and application to the proven circumstances before us in this case. Much has been written and said about occupational disease and our own Occupational Diseases Act. A complexity has been thereby created out of a simplicity. The Act, when its verbiage is assembled in logical sequence and common language, merely provides that where the diseased workman works in surroundings and conditions which are usual, common, and ordinary in all employments, he cannot, simply because he becomes a victim of a disease while working for his employer, claim compensation therefor. But when his surroundings and conditions of work possess within themselves inherent risks, dangers, and hazards which are *not* present in other employments, and he contracts a disease due to his working amid and exposure to such risks and hazards which furnish the roots or cause of the disease from which he suffers, resulting in his

disablement, compensation therefor is afforded. The employee's disease may be of a class or nature which the members of the general public may acquire under ordinary and usual circumstances and conditions but, if the disease from which he suffers *did not in fact* arise out of such usual and ordinary circumstances and conditions and *was in fact* occasioned as a result of being subjected to risks and hazards afforded by the particular, peculiar, or unusual conditions of work in his employment, he would be entitled to the benefits of the statute upon the proper legal establishment of such facts in accordance with the procedure required for an appropriate finding of the Industrial Board. The question is not whether the workman has a disease which is more or less common to others of the general public, but whether the *particular conditions* of his work were such as to cause and did cause him to acquire the disease.

It may be urged that these expressions savor too much of the same principles that have been applied to the Workmen's Compensation Law. The fact is that we *are* dealing with a *compensation law* for workmen. The original Workmen's Compensation Law was restricted to injuries occasioned by accident or mishaps in the employment resulting in a physical personal injury or death. No provision was made therein for disablement by disease. The Occupational Diseases Act undertook to supply the deficiency. It contains much of the substance of the Workmen's Compensation Act. Mr. Small, in his work on the Workmen's Compensation Law of Indiana, Section 13.1, page 421, says:

"The background of Compensation Act and the Liability Act experience, in addition to proving the need for disease legislation, probably figured in the

selection of a form for the Diseases Act. Where it is applicable to an employment, its terms and provisions *are almost a repetition of the Compensation Act."* (Our emphasis.)

In In Re: Jefferies (1938), 105 Ind. App. 349, 351, 14 N. E. 2d 751, the court enunciated:

"The purposes to be accomplished by the Workmen's Compensation Act and the rules controlling its administration and *construction* have been repeatedly announced by this court. It is not necessary that we again restate them. It is sufficient to assert that *they are applicable to the Workmen's Occupational Diseases Act."* (Our emphasis.)

Goldberg, in his work on Occupational Diseases, page 125, states:

"With more adequate methods of discovering and diagnosing occupational diseases in their incipiency, more cases will probably reach the courts. . . . it seems likely that the courts will tend to give liberal interpretations to the laws. . . ."

The views and interpretations herein expressed have been presaged by several previous expressions of our courts. In the case of *Loucks* v. *Diamond Chain & Manufacturing Company* (1941), 218 Ind. 244, 32 N. E. 2d 308, the opinion of Fansler, J., broke somewhat from the former hard and fast rule by holding that:

". . . the absence of, and *inability of the doctors to discover, any other possible cause for his condition, seem sufficient to establish that he was* the victim of an occupational poisoning." (Our emphasis.)

Later, in 1942, Flanagan, J., speaking in the case of *Harbison-Walker Refractories Company* v. *Turks et al.* (1942) 110 Ind. App. 563, 566, 39 N. E. 2d 791, said:

"The Workmen's Occupational Diseases Act is a practical statute, having for its purpose the accom-

plishment of a definite humane purpose. It should be mantled in the spirit of the objective, not shrouded in a haze of over-technical interpretations."

In *Chevrolet-Muncie Division of General Motors Corporation* v. *Hirst* (1943), 113 Ind. App. 181, 189, 46 N. E. 2d 281, Draper, J., held:

"... that our statutes *do not provide* that ordinary diseases of life to which the general public is exposed outside the employment *may not under proper circumstances be compensable. . . .*" (Our emphasis.)

In an able and cogent dissenting opinion in the case of *McGill Manufacturing Company, Inc.* v. *Dodd* (1945), 116 Ind. App. 66, 71, 59 N. E. 2d 899, Royse, J., expressed his disagreement with the majority in these words:

"... I feel their opinion places a narrow construction on the beneficent purposes of the Indiana Workmen's Occupational Diseases Act not intended by the Legislature. . . . I construe this subdivision Subd. (a) to mean that where an *ordinary disease of life* is contracted as a result of conditions appertaining to or depending on the employment which arose out of and in the course of the employment, there is a compensable occupational disease. . . . I construe this first sentence of this subdivision Subd. (b) to mean that an occupational disease arises out of the employment where there is a direct connection between its cause and *the conditions under which the work is performed,* which reasonably may be determined to have followed as a *normal* result of the exposure occasioned by the work . . . and which may be traced to such employment as a proximate cause of the disease, provided, of course, it does not arise from a hazard to which there is an *equal* exposure outside the employment. . . ." (Our emphasis.)

Appellant, in its brief, urges that "there was abundant proof that the inflammation from which appellee suffered, if there was any, was one to which the general public is exposed outside of any employment." While we cannot concur in the allegation that there was "abundant" proof of such alleged fact, yet there was some medical testimony concerning the matter. This was brought out by questions of the appellant pertaining to the breathing by the general public of "ordinary" dust but the answers of the physicians indicated they were referring to the breathing of inert and contaminated substance and not the "common exposure to a very light constituent." Nevertheless, we have concluded to proceed with the determination of this appeal upon the basis that appellant has correctly surmised the ultimate factual conclusion. Upon such supposition, the question is presented as to whether, in point of law, under evidence establishing that appellee's secondary disease, viz: bronchiectasis, a disease which the general public could develop if the conditions were sufficient, is a result of appellee's primary disease, viz: inflammation of the lungs and bronchial tubes, a disease to which the general public may be exposed under sufficient conditions outside of the employment, the appellee would be entitled to compensatory relief under the provisions of the Indiana Occupational Diseases Act.

We can best pursue and develop the question by considering, in sequence, the contentions made in appellant's brief. In general, appellant evinces great anxiety that the Occupational Diseases Act may be "thrown open to the demands of those whose sicknesses do not comply with the provisions of the statute," and appellant cites certain decisions of this court which appellant says "in the main has been careful to exclude all diseases to which the general public is exposed. . . ."

Attack is made upon the holding of this court in the case of *Chevrolet-Muncie Division of General Motors Corporation* v. *Hirst, supra,* in this language:

"Appellant believes this court in the case of Chevrolet-Muncie Division of General Motors Corporation v. Hirst, supra, really went beyond the intention of the Legislature when it decided that bronchiectasis is an occupational disease, upon the theory that it was incidental to an inflammation of the lungs caused by an employment, *when there was no proof that such inflammation was an ordinary disease of life to which the general public is exposed outside of the employment.*" (Our emphasis.)

We do not understand that the Hirst case went off on the simple fact that no proof was made that the inflammation to which the bronchiectasis was incident is an ordinary disease of life to which the general public is exposed. It is true that such statement was made in the course of the court's observations in the decision. But the conclusion of the court did not rest upon that premise. The court was very specific in stating the gravamen of its decision in these words:

". . . we have carefully considered the evidence in this case and we are convinced that in this particular case the disease of bronchiectasis followed as an incident of an inflammation of the lungs and bronchial tubes *which itself arose out* of and in the course of appellee's employment by the appellant *under circumstances consistent with the requirements of subdivision (b) of section 6 of said act.*" (Our emphasis.)

It is nowhere apparent in the decision of the court in that case that a different result would have been reached had it been shown by the evidence that the inflammation was a disease to which the general public may be exposed outside of the employment.

Appellant further insists that recovery cannot be had as an occupational disease unless the following *"recognized characteristics"* of such disease are present: (1) it must not be one of the ordinary diseases of life to which the general public is exposed; (2) it must result from conditions of work "to which all employees of a class as such are exposed"; (3) it is the result of "a long period of exposure" to certain elements *usual* and *common* to that industry; and (4) it must be a natural and common result rather than an "unexpected" one. (Our emphasis.) The carte blanche adoption by us of such uncompromising "characteristics" would render the Act impotent and useless. Appellant applies a strict and literal construction to certain words and phrases in the Act without resolving them in the light of the evident ultimate purposes, intents, and objectives of the Act considered as a whole. We will consider each of said alleged requisites.

(1). In determining whether a disease suffered by the workman is one "to which the general public is exposed," consideration must be given to the circumstances and conditions under which he is required to labor. As heretofore stated, the disease itself may be "ordinary" in the sense that it is an ailment to which many people are exposed to and suffer from, but the conditions of employment of the workman may involve a *special* or *inherent* risk or hazard of disease to which he is exposed but to which the public is not exposed. The Act provides that an occupational disease must "arise out of and in the course of the employment." These are not idle words and seem logically to convey the legislative intent that the employment must furnish or involve some *feature, condition, nature, or character* which subjects the workman to a risk or hazard of disease which is not common to

the public outside the employment. For a disease to *arise out* of the employment imports that the nature and conditions of the employment are such that the contracted disease was one likely to be acquired by the workman in that employment. Where it appears that the causative danger is inherent in or peculiar to the work performed under the then prevailing conditions which are not common to the general public outside the employment, the disease *arises* from the employment if it is causally connected therewith. Thus it appears that appellant's first requisite is too restrictive.

(2). There is nothing in our Act which requires or implies that the work conditions must subject all the employees as a "class" to the same exposure. Although this idea is found in the case of *Goldberg* v. *954 Marcy Corporation*, 276 N. Y. 313, 12 N. E. 2d 311, yet the general definitions given by the court in that case are strongly consonant with our own. We do not consider that the court there spoke in the same vein as expressed by appellant nor that the court there expressed a "class" subjection as a necessary characteristic. All members of the human family are not physically constituted alike. Some are more susceptible to a given disease than are others. Some have greater powers of resistance to disease elements of a given nature. For example, some people "take" colds easily and under wholly non-generative conditions, while others under the same circumstances acquire it not. Some carry within themselves latent or dormant seeds of disease which are subject to be activated by certain conditions and to progress to the point of disablement or even death. Some are "allergic" to certain substances, conditions, or gases. It may be conceded that under the conditions of work the "exposure" may be common to all the employees, whether by class

or otherwise, but it does not result that *all* of the employees would necessarily become afflicted with the disease. If appellant means by his said "characteristic" that all employees in the same place and under identical conditions are alike "exposed" to the same hazards of disease, we find no fault therewith. But if it is meant that in order to fall within the definition of occupational disease as given in section 6 of the Act, the disease must have a tendency to affect all the employees as a "class," we cannot subscribe thereto.

(3). The Act does not demand "a long period of exposure." In fact, the Act expressly provides against such a requirement. In Section 26 of the Act, Burns', 1952 Replacement, Section 40-2226, it is provided:

"An employee shall be conclusively deemed to have been exposed to the hazard of an occupational disease when *for any length of time, however short,* he is employed in an occupation or process in which the hazard of the disease exists." (Our emphasis.)

(4). The Act does not provide that the disease need be an expected one. On the contrary, subdivision (b) provides that "The disease need not have been foreseen or *expected . . .*" (Our emphasis.)

Appellant says in its brief that the decision of the Board in this case is not consistent with our decisions in the cases of *Russell* v. *The Auburn Central Manufacturing Company* (1939), 107 Ind. App. 17, 22 N. E. 2d 889; *Schlechtweg* v. *McQuay-Norris Manufacturing Company* (1946), 116 Ind. App. 375, 64 N. E. 2d 664; *Fuller* v. *Delco-Remy Division of General Motors Corporation* (1945), 116 Ind. App. 272, 63 N. E. 2d 542; and, *Reid* v. *Ontario Manufacturing Company* (1947), 117 Ind. App. 273, 70 N. E.

2d 357, and that if we sustain the Board's decision herein, such action will be wholly inconsistent with its position in the case of *Star Publishing Company* v. *Jackson* (1944), 115 Ind. App. 221, 58 N. E. 2d 202, as well as in the case of *McGill Manufacturing Company* v. *Dodd* (1945), 116 Ind. App. 66, 59 N. E. 2d 899. We are not in accord with appellant's position with reference to these previous holdings of our court. The court in the Russell case held there was competent evidence that appellant's disease had no connection with his employment; and in the Schlechtweg, Fuller, and Reid cases it was simply held, in each instance, that the evidence was conflicting and therefore the court would not weigh the evidence nor substitute its judgment for that of the Board, and that the evidence was not so conclusive as to force a contrary holding by the court. The Star case and the McGill case both involved a consideration of nerve and mental afflictions. In the Star case, the court held the evidence did not show the neurosis to be an occupational disease, but rather a "chronic fatigue" which "in its very nature" is common to all employments. In the McGill case, the majority of the court held there was no evidence that the causative inducing the mental condition was an occupational disease within the definition of the statute. None of these cases offer support to appellant's insistence that, in this case, we declare a rule which would, in effect, deny protection to all claimants except those suffering from diseases which are commonly known to result from particular or exclusive types of businesses. As heretofore pointed out, if such had been the intent of the Legislature, it would have scheduled or specifically named such diseases with an excluding clause as to all others. It cannot be presumed that the Legislature intended to grant relief to all sufferers of personal injury, or their de-

pendents in case of death, who come within the provisions of the Workmen's Compensation Law, but to deny like relief to sufferers of disease, or their dependents in case of death, except in the case of unusual, uncommon, or special diseases.

Appellant further alleges in its brief that "all authorities agree that iron dust does not constitute a health hazard." However, we refer to the case of *Peru Plow & Wheel Company* v. *Industrial Commission* (1924), 311 Ill. 216, 142 N. E. 546, on page 549, wherein the court said:

> "From all that appears in the record in this case *his disability* arose out of continued *breathing* of *iron dust* in his particular occupation. *It appears from the medical testimony* to be a *characteristic* and *natural result* of *continued inhalation of iron dust.*" (Our emphasis.)

See, also, the first paragraph on page 22 of Goldberg on Occupational Diseases.

But one further point remains for consideration. It is: Whether, as appellant contends, the assumed fact that the primary disease, viz: the inflammation of the lung tissues and the bronchial tubes, is shown by the evidence to be a disease to which the general public may under sufficient conditions be exposed outside the employment, results in its exclusion as an occupational disease under the provisions of the Occupational Diseases Act so as to render the award of the Board contrary to law. It is noted that Subd. (b) of the Act, providing the requisites necessary for a disease to be considered occupational, and to which an ordinary disease common to the public must be incidental, *does not except such ordinary diseases from its provisions.* Such Subd. (b) requires the establishment of conditions and circumstances of employment, con-

sistent with the provisions of the Act, which provide a risk or hazard of disease, and that the acquired disease bears a causal connection with such conditions and circumstances of employment, and results as a natural incident of exposure thereto. Thus, it appears that even though the Act provides in Subd. (a) that the secondary disease (in this case the bronchiectasis) in order to be compensable be not an ordinary disease to which all members of the public are alike exposed, yet it contains no such provision in Subd. (b) as to the primary disease (in this case the inflammation of the lung tissues and bronchial tubes). Therefore, we hold *that in the instant case*, the appellee *having established a special hazard in his employment* which causally resulted in the said primary disease, no bar is raised because such primary disease may be one to which the general public under sufficient conditions may be also exposed.

It is not the aim or purpose of the Act to set up an insurance plan or make the employer an insurer. *McGill Manufacturing Company* v. *Dodd, supra.* We cannot, by judicial pronouncement, declare it a source of employee compensation for all the "ills all human flesh is heir to." The interpretation we have herein placed upon the Act seems to us to be consonant with justice and the intent of the Legislature as expressed by the written Act, and in accord with the apparent leanings of our courts as indicated in their previous holdings. In all cases the claimant must establish that the disease of which he complains arose out of and in the course of his employment *under circumstances consistent with the requirements of subdivision (b) of section 6 of the Act.*

In the instant case, the evidence most favorable to appellee, though conflicting in some respects, was of

sufficient probity that the Board could and did conclude therefrom that it established that appellee, a man without any serious illness prior to engaging upon his work for appellant, was compelled to daily work in quarters without ventilation or blowers, and his work was of such nature as to require him to be very active and to breathe deeply for many continuous hours of air laden with deleterious and contaminated substances; that these substances consisted of ordinary dust, iron particles, and irritating chromates and oxides; that such substances irritated the bronchial tubes and lung tissues and caused inflammation thereof, from which appellee suffered a disease known as bronchiectasis which was an incident of an occupational disease as defined in section 6 of the Occupational Diseases Act; that there was a causal connection between the disease and appellee's work conditions; that the disease followed as a natural incident of exposure thereto occasioned by the nature of appellee's work and employment; and that appellee suffers from a temporary total disability due to such disease.

Upon a consideration of all the evidence, we cannot say that the finding of the Board does not rest upon a rational basis or that its conclusion is unwarranted or contrary to law.

The award of the Industrial Board is affirmed.

Royse, C. J. not participating.

NOTE.—Reported in 112 N. E. 2d 221.