## MUTUAL CHEMICAL COMPANY ET AL. *v.* THURSTON

[No. 154, September Term, 1959.]

---

88

*Decided March 17, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Theodore C. Waters,* with whom were *Theodore C. Waters, Jr.,* and *Miles & Stockbridge* on the brief, for the appellants.

*Ellis M. Fell* and *Morton H. Perry* for the appellee.

HORNEY, J., delivered the opinion of the Court.

The sole question on this appeal is whether there was sufficient evidence to support the findings of the Medical Board for Occupational Diseases (the Medical Board) to the effect that the claimant had sustained a compensable occupational disease—from long exposure to the inhalation of chrome products—which resulted in permanent total disability. The Workmen's Compensation Commission (the Commission) affirmed the Medical Board, and when the Superior Court of Baltimore City affirmed the Commission, the employer and insurer ap-

pealed, claiming primarily that the pulmonary dust disease the claimant had contracted was not a hazard characteristic of and peculiar to his employment.

James A. Thurston (the claimant) was first employed by the Mutual Chemical Company (the chemical company or employer) in February of 1925 and continued working until July of 1930. He was re-employed (after the great depression) in August of 1932 and worked continuously until December 21, 1956. During the times he was employed by the chemical company, he had worked as a crane operator, a leach plant operator and a residue dryer operator. In whatever capacity he worked he had been continuously exposed to chrome in the form of fumes and dust. In 1953 the claimant began to lose weight, to cough and spit blood. He was examined by the company doctor and was referred by him to Dr. John E. Miller in September of 1953. From then on—in 1954, 1955 and 1956—he was re-examined and x-rayed from time to time. Among other things his lungs were bronchoscoped twice. In October of 1956 an x-ray examination revealed some infiltration in the right upper lung field and bronchogenic carcinoma was suspected. Further studies were made and in January of 1957 it was recommended that an exploratory thoractomy be performed. The presumptive diagnosis was lung cancer and a secondary pulmonary infection. The operation was performed and, because of the poor condition of the lung, it was removed. During the course of the operation the claimant suffered a cardiac arrest but was resuscitated. In March of 1957 another operation was performed and six ribs were removed.

When the claimant filed his claim alleging permanent disability—by the removal of a lung due to malignancy—the employer and insurer contested the claim and raised issues as to whether the claim was compensable, whether the claimant sustained an occupational disease and the nature and extent of the disability suffered.

Testimony—mostly medical in nature—was taken before the Medical Board on four different dates between December of 1957 and March of 1958. The claimant and a fellow worker on his behalf testified as to the types of work the claimant had

performed and the manner in which he had been subjected to chrome fumes and dust. But before this testimony had been completed it was admitted—in a colloquy between members of the Medical Board and counsel for the parties—that the claimant had been long exposed to fumes and dust from chrome. Apparently, the fact that the claimant was permanently disabled was not disputed.

During the course of the hearing, the employer stated that because of statistical data—and despite the absence of medical evidence of a causal connection between bronchogenic carcinoma and the production of chromium chemicals—it had voluntarily paid workmen's compensation to each of its employees who had developed either perforated nasal septa or bronchogenic carcinoma. In fact a claim by this claimant in 1951 for a perforated nasal septum was compromised and settled by the parties. In the instant case, since the claimant had not developed a bronchial cancer, as had been anteoperatively diagnosed, the principal remaining issue for the Medical Board to decide was whether the claimant had contracted an occupational disease within the meaning of the statute.

Dr. Miller, the operating surgeon who removed the right lung, and who had suspected the claimant had a bronchial cancer before the operation, subsequently diagnosed the condition as chronic fibroid pneumonitis. He believed that exposure to chrome was not a factor in causing the pneumonia and that the claimant's condition was not related to his employment. According to Dr. John E. T. Camper, he had received a written report from Dr. Miller to the effect that the claimant had cancer of the lung, but such report was not offered in evidence.

Dr. Russell S. Fisher, the pathologist, diagnosed the claimant's condition as pneumonia and inflammatory bronchitis. He found no evidence of cancer; nor could he establish tuberculosis. He had not seen this kind of organized pneumonia in any of the lungs of other chrome workers that he had examined and saw no reason to claim that the pneumonia was connected with his employment.

Dr. Anna M. Baetjer testified that five years of effort failed

to produce lung cancer in animals which had been subjected to mixed chromate dust supplied by the chemical company. She acknowledged, however, that exposure to chrome could cause lung damage if it was in an irritating form and the tissue it came in contact with was susceptible.

Dr. Hugh J. Welch, a specialist in diseases of the chest, attributed the cause of the claimant's condition to "chronic environmental irritation leading to a chronic infection of the nasal and bronchial respiratory system * * * causing such a degree of hyperplasia that he lost his lung" and stated that the claimant had a "fibrous right lung, acute and chronic pneumonitis with chemical origin." He had seen only one other case definitely comparable to that of the claimant. He stated unequivocally that there was a relationship between perforation of the septum and pulmonary changes. When he was asked whether a person exposed to chromium irritation over a long period of years would get the kind of disease the claimant had, he answered, "It would be a rare one that wouldn't." Dr. Edward F. Cotter, another chest specialist, who had made a report in the hospital record, but did not testify at the hearing, recorded that there had been "wide-spread bronchial changes * * * in the form of a chronic bronchial inflammatory reaction with squamous metaplasia of the bronchial mucosa, bronchial edema, ulceration and stenosis with extensive organizing pneumonia" and then added "one would have to consider chronic chromium irritation as a likely contributory factor unless it can be shown that his exposure was minimal." When Dr. Welch was asked if he agreed with Dr. Cotter's report he stated that he did.

Dr. Wilhelm C. Hueper, chief of the environmental cancer section of the National Cancer Institute, after reviewing the pathological report and the reports of several other doctors as well as the medical and employment records of the claimant, likewise diagnosed his condition as "chronic fibrosing pneumonia with development of localized emphysema, both of them probably developing on the basis of chronic ulcerative bronchitis caused by the inhalation of corrosive material." He was of the opinion that the condition of the claimant was "most likely" due to exposure in the employment. He further testi-

fied that, according to statements found in medical literature in this country as well as in Europe, bronchitis, as well as pneumonia and tuberculosis, is excessively frequent among chromate manufacturers. Together with Dr. T. F. Mancuso, he had performed experiments in chromate plants and together they published an article[1] in which it was stated that chromate workers developed a fibrosing pneumonia. In a letter dated February 10,. 1958, Dr. Hueper stated that it was a statistically established fact that chromate workers have an excessive frequency to bronchitis and cited several medical authorities for his statement. He further noted, with respect to the occupational origin of the pneumonia, that epidemiologic investigations of workers in seven American chromate plants showed that such work groups definitely had an excessive rate from all forms of pneumonia, and that it had been established that chromate manufacturers develop a fibrosing pneumonia. He concluded the letter by stating that "the bronchial and pulmonary changes which developed in the * * * [claimant] during his employment in a chromate manufacturing operation are with a high degree of probability attributable to the toxic and corrosive action of specific occupational factors upon the tissues involved." The witness disagreed with a public health service bulletin to the effect that pulmonary markings suggestive of fibrosis were not important among chromate workers; nor did he agree that persons exposed to chrome do not have significantly more respiratory illness than the general public. This was the first case, however, that he had first hand knowledge of involving ulcerative bronchitis due to chrome exposure. In another article,[2] written by Dr. Mancuso alone, he stated that "workers exposed to inhalation of chromate and chromite dust may develop various acute and chronic injuries to the tissues of the respiratory system, including ulcers and chemical pneumonitis."

On this evidence produced at the hearing — though in greater detail, of course—the Medical Board found that the

---

1. The article is entitled "Occupational Cancer and Other Health Hazards in a Chromate Plant—Part II."

2. This article is Part I of that entitled "Occupational Cancer and Other Health Hazards in a Chromate Plant."

claimant had "some reaction to his lungs from his long exposure to the inhalation of chrome products," and then added "[e]ven though effective testimony was given by capable people to refute the irritative effect and ultimate lung damage from the occupational exposure, there is still strong indication that the chrome products were of great influence in the claimant's illness." It further found that the claimant, who was disabled by the operative removal of one of his lungs and its *sequelae,* was entitled to an award for permanent and total disability.

While the findings of the Medical Board are not as specific as might be desired, there is no doubt that it found as a fact that the "reaction to his lungs" and the ultimate lung damage suffered by the claimant was due to or was greatly influenced by the irritative effect of the long occupational exposure to the inhalation of chrome products. That would seem to be a sufficient finding on the issue of whether the claimant sustained an occupational disease since the finding was well within the definition of that term set forth in *Foble v. Knefely,* 176 Md. 474, 6 A. 2d 48 (1939). See also 1 Larson, *Workmen's Compensation Law,* § 41.32, for modern statutory and judicial definitions of the term "occupational disease."[3] The employer and insurer, however, in contending that it must be assumed —since it did not specifically find—that the Medical Board concurred in the diagnosis that chronic bronchitis and pneumonia caused the claimant's condition, also complain that the Board failed to make specific findings with respect to whether the disability of the claimant had met the statutory standards set forth in Code (1957), Art. 101, sec. 23(d), concerning compensability for a disability caused by a pulmonary dust disease. The reason the Board did not make the findings now deemed essential by the employer and insurer was undoubtedly

---

**3.** Larson in this § 41.32, after commenting that many of the older definitions distinguishing occupational diseases from accidents have been largely abandoned, goes on to say that the important boundary now is that "separating occupational disease from diseases that are neither accidental nor occupational, but common to mankind and not distinctively associated with the employment," for which a new set of standards must be used.

because specific issues with respect thereto were not raised by them. It may also be noted that the statute [Sec. 23(d)], absent presentation of specific issues, does not in terms specifically require the findings claimed to have been omitted. In any event, it is certain the omission can have no effect one way or the other on the answer to the question we must decide.

The only issue in this case is whether the claimant sustained an occupational disease. The Medical Board made specific findings as to all of these issues, particularly the important one, when in compliance with the terms of the statute [Art. 101, *supra*, Sec. 22(a)], it found in effect that the claimant was injuriously exposed to the hazards of an occupational disease and that such disease was due to the nature of the occupation or process in which the claimant was employed. When, however, a disability is found to be due to a pulmonary dust disease, the statute provides that the employer is not liable for compensation *unless* it is further shown that the disability was "due to the nature of the employment in which the hazards of such disease actually exist, are characteristic of and peculiar to the trade, occupation, process, or employment, and is actually incurred in * * * [the] employment." Art. 101, sec. 23(d), *supra.*

Thus, the real question is whether there was sufficient evidence to show that the pulmonary dust disease, which the Medical Board found the claimant had contracted, arose out of exposure to a harmful condition in the employment which was characteristic of and peculiar to such employment and was actually incurred therein. Until it was shown that these essential statutory conditions had been fully met, the Board was without power to find as a fact that the claim was compensable. Moreover, the burden of showing that he came within the provisions of the statute was on the claimant. *Gower v. Davis Coal & Coke Co.,* 197 Md. 52, 78 A. 2d 195 (1951). We think it was implicit in the findings of the Medical Board that it had also found the claimant had complied with the statutory requirements. Therefore, if the evidence supports those findings, we must affirm. If it does not, we must reverse.

We are not required, however, to determine whether the

Board and Commission arrived at the correct conclusion or whether we would arrive at a different one. *Duncan v. Mc-Nitt Coal Co.,* 212 Md. 386, 129 A. 2d 523 (1957). Nor is it the function of this Court to pass upon the weight of the evidence or resolve the conflicts in the testimony of the expert medical witnesses. *Bethlehem-Sparrows Point Shipyard, Inc. v. Bishop,* 189 Md. 147, 55 A. 2d 507 (1947). Indeed, the statute specifically provides that "in all appeals in which occupational diseases are involved, the findings of fact by the Commission shall be final and not subject to review or modification by the court." Art. 101, *supra,* sec. 56 (a). This does not mean—since the sufficiency of evidence is a matter of law —that the Commission's findings are not subject to review if they are not supported by the evidence produced. *Duncan v. McNitt Coal Co., supra.* But it does mean that our review is limited to the question whether there was "some evidence or legally sufficient evidence" to support the findings of the Commission that the claimant had sustained a compensable occupational disease. *Beechwood Coal Co. v. Lucas,* 215 Md. 248, 137 A. 2d 680 (1958).

What then does the evidence, and particularly the medical evidence, show?

It was conceded that the claimant had been subjected to chrome dust and fumes over a long period of time. It was not disputed that the claimant was permanently disabled. It was generally agreed by most of the medical experts that chrome products will irritate the lungs. The doctors, in varying degrees, stated that the claimant suffered from chronic ulcerative bronchitis and a pneumonitis. There was evidence— though there was also evidence to the contrary — that the pulmonary dust disease suffered by the claimant was due to the nature of the employment in which the hazards of the disease actually exist. There was also evidence that occupational hazards in the chrome industry do exist and that pulmonary dust diseases, such as chronic bronchitis and pneumonia, are characteristic of and peculiar to chrome workers, but there was also evidence that it has not been certainly established that the rare and unusual combination of ailments

which had disabled the claimant was due to exposure to chrome fumes and dust.

In 1951 Maryland switched from a schedule-type coverage [4] of occupational diseases to a general-type coverage.[5] In *Kelly-Springfield Tire Co. v. Roland,* 197 Md. 354, 79 A. 2d 153 (1951), decided before the enactment of the present statute, when only the occupational diseases specified in Code (1947 Supp.), Art. 101, sec. 21, were compensable, and sec. 23 imposed a further limitation [applied now only in cases where silicosis, asbestosis and other pulmonary dust diseases are compensable] that the disease must be "characteristic of and peculiar to the trade, occupation, process or employment" and must have actually incurred in the employment, this Court held that asthma as an occupational disease of a worker in a rubber products factory was not compensable because asthma was not a hazard characteristic of and peculiar to the employment. However, in that case the testimony showed without contradiction that asthma had never been known to occur—in either of two tire and rubber plants—as a result of the employment in which the claimant was engaged. The employer and insurer rely on the decision in the *Roland* case to support their position in the present appeal, but we think it is clearly distinguishable on the facts. There, the trial court found—and we affirmed—that nowhere was there any evidence that asthma was a hazard characteristic of and peculiar to the occupation of the claimant. Here, there is certainly "some substantial and legally sufficient evidence" that the pulmonary dust disease the claimant contracted arose out of a harmful condition in the employment which was characteristic of and peculiar to such employment and was actually incurred therein. The case of *Brown Shoe Co. v. Fooks,* 228

---

4. In the schedule of compensable occupational diseases set forth in Code (1947 Supp.), Art. 101, sec. 21, repealed in 1951, the 19th disease listed was described as "[c]hrome ulceration * * * or * * * [its] *sequelae"* and the process or occupation was described as "* * * the use of or direct contact with chromic acid * * * or * * * [its] preparations."

5. See Chapters 287-292 of the Acts of 1951.

Ark. 815, 310 S. W. 2d 816 (1958), on which the employer and insurer also relied, was, like the *Roland* case, one in which the claimed occupational disease was not common to the industry in which the claimant worked, and for that reason is likewise distinguishable from the case at bar.

The cases in other jurisdictions—such as *Crutcher Dental Depot v. Miller,* 251 Ky. 201, 64 S. W. 2d 466 (1933); *Shoemaker v. Electric Auto-Lite Co.,* 41 N. E. 2d 433 (Ohio App. 1942); *Ramsey v. Bendix Aviation Corp.,* 314 Mich. 169, 22 N. W. 2d 259 (1946); and *Schwitzer-Cummins Co. v. Hacker,* 112 N. E. 2d 221 (Ind. App. 1953)—cited by the claimant, although not directly in point in that they involve different factual situations and statutory provisions from those with which we are presently concerned, tend to show that lung irritations caused by long exposure to chromic fumes and dust do exist in the chrome industry, and further tend to establish the fact that some lung diseases, such as pneumonia and bronchitis, are hazards of employment in chrome plants. Indeed, in the *Hacker* case, under a statute comparable to ours, it was held that there was a causal connection between the bronchiectasis — a disease marked by dilation of the bronchi — that the milling machine operator had contracted and the iron oxide, zinc chromate and chromate oxide to which he had been exposed during the course of his employment.

We think we must decide this case, as did the lower court, on the basis that there was *some* substantial or legally sufficient evidence to support the finding of the Commission that the Medical Board was correct when it found that the claimant had sustained a compensable occupational disease.

For this reason we shall affirm.

> *Judgment affirmed, the appellants to pay the costs.*