Anna Vivian GADDIS, Claimant-Respondent,

v.

RUDY PATRICK SEED DIVISION et al., Defendants-Appellants.

No. 25885.

Missouri Court of Appeals, Kansas City District.

Oct. 2, 1972.

John R. Gibson, Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, for defendants-appellants.

Max Von Erdmannsdorff, Von Erdmannsdorff & Kuhlman, North Kansas City, for claimant-respondent.

WASSERSTROM, Judge.

Respondent filed claim before the Workmen's Compensation Commission for occupational disease. An award was made in her favor by the Referee, and that award was affirmed by the Industrial Commission. On appeal to the Circuit Court by the employer and its insurer, that Court again affirmed. The employer and its insurer now appeal to this Court. We likewise affirm.

The facts in skeletal form are as follows. The claimant commenced work for the employer in 1950. At that time she was in good health, and had no disability. She had a childhood disease of whooping cough and later measles, but to her knowledge she had never suffered any disease of the lungs. She had always been a nondrinker and non-smoker.

From 1950 until April, 1967, the claimant was a part-time seasonal worker. On the latter date she began work full-time for the employer. Until February, 1969 she did work in an office, where she had a desk, and also performed other duties. However, in February, 1969, she was "bumped off" that job and her work became concentrated in the warehouse area.

As the name of the employer indicates, it is in the business of handling and selling plant seeds. Until 1955, the seeds were handled without special pesticide treatment. Then in about 1955 the employer began to treat its seeds with various chemical pesticides and herbicides, including Dieldrin, Ceresan, Arasan and DDT. Claimant's work involved proximity to these seeds and the pesticide coating in various ways. This included the operation of two packaging machines by which the seeds were dropped through a small chute into small seed bags held by claimant. She also operated a sewing machine to close the seed bags. Some ventilating equipment was in use, but there is evidence that the ventilating was far from completely effective. Pink dust from the seeds was visible in the

air throughout the workplace. Fans used for ventilation on a nearby bagging machine blew the pink dust directly toward claimant when she was working at her machine. Another of claimant's duties was to sweep the floors from time to time, upon which pink dust from the seeds would accumulate to a depth of up to four inches.

There was evidence that the pink dust from the seeds settled upon the employees' hair, face and hands; that the chemicals caused a stinging sensation; and that the chemical dust also caused employees to cough and sneeze.

In May, 1969, the claimant found blood welling up into her mouth. She then received extensive medical attention. Since May, 1969, she has been unable to and has not worked. The medical testimony is unanimous that the disease from which she suffers is bronchiectasis.

The appellants urge the following points as ground for reversal: (1) the finding that claimant suffered an occupational disease is not supported by the evidence and is contrary to the overwhelming weight of the evidence; and (2) the facts as found do not support the award.

I

The argument by appellants in support of the contention that there was no occupational disease can be summarized under the following headings: (a) that bronchitis and bronchiectasis are not "incidental to the character" of the employer's business; (b) that both bronchitis and bronchiectasis are "ordinary diseases of life";[1] and (c) that claimant's present condition is the result of her own special personal susceptibility.

A. § 287.067(1), in defining the term "occupational disease", does provide that the disease "must be incidental to the char-

acter of the business and not independent of the relation of employer and employee". However, that provision is not to be read in the narrow, restricted sense which is urged by the appellants. This question was only very recently considered by this Court in Collins v. Neevel Luggage Mfg. Co., Mo.App., 481 S.W.2d 548, l. c. 554, where we held:

> "Contrary to the view appellants' argument suggests, whether a disease is occupational is not to be determined by whether the disease is literally peculiar to an occupation, but whether there is 'a recognizable link between the disease and some distinctive feature of the claimant's job *which is common to all jobs of that sort*' ".

The argument submitted by appellants, similar to that which was presented by appellants in the Collins case, rests upon the concept that there are certain diseases peculiar to particular occupations, and which are susceptible of precise enumeration. That is indeed the principle upon which occupational disease statutes of some states is founded. Larson's Workman's Compensation Law, Vol. 1A, § 41.11. However, that is not the principle of the larger group of states of which Missouri is a member. This matter is well stated in Schwitzer-Cummins Co. v. Hacker, banc, 123 Ind.App. 674, 112 N.E.2d 221, l. c. 224–225:

> "In many ways the appellant, in its brief, appears to urge upon us a limitation of the scope and application of the Act to a few diseases of an *unusual nature* which are natural incidents of employment in a *particular* calling or occupation, and which are from common experience known to be *usual* and *customary incidents to such callings or occupations*. The ultimate result of the acceptance and approval by us of such a premise would be the establishment of the doc-

---

1. Since appellants discuss these sub-points (a) and (b) separately, we shall also. However, the points are so closely interrelated that they amount to obverse state-

ments of the same principle. See Larson's Workmen's Compensation Law, Vol. 1A, § 41.32, p. 622.114.

trine that the Indiana Occupational Diseases Act should be construed as if the same required the scheduling or specific designation of certain particular diseases as falling within its provisions and that such diseases only would be compensable. If such be appellant's proposal we find ourselves out of harmony therewith.

"That such was not the intent or the spirit of the Act is evident from the arrangement and the wording of the Act and the omission therefrom of the scheduling or specific designation of compensable diseases. The Occupational Diseases Act of the various states of the Union have indicated that they are divided into two groups, those adhering to what is commonly designated as the 'general' definition and those which have, to a more or less extent, provided a 'specific description' or a 'scheduling' of diseases to be construed as falling within the terms of the Act. By the provisions of the Indiana Act, she has aligned herself with those states under the 'general' definition rules. Other states of present like adherence are: California, Connecticut, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New York, North Dakota, Ohio, Oregon, Washington, and Wisconsin."

■■ As indicated by the foregoing authorities, the question of whether the disease was incidental to the occupation depends upon whether there is a recognizable link between the disease and some distinctive feature of claimant's job. Such linkage was found in detail by the Commission's findings, and those findings are amply supported by the evidence concerning the working conditions and claimant's medical testimony that irritation to the lungs and bronchial tubes from the chemical dust in the plant could and did cause the bronchiectasis.

■ B. The statutory definition of "occupational disease" also states that "ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable * * *." Appellants seize upon this portion of the statutory definition for their next argument. They claim that members of the general public are exposed to and succumb to bronchiectasis outside of any employment, and on this basis they argue that bronchiectasis is just an ordinary disease of life.

Precisely the same argument was considered in the Collins case, supra, which this Court rejected as follows:

"To accept the implications of this view is to nullify the efficacy of the Act and its legislative purpose 'to render more certain the employee's compensation' for occupational disease (Marie v. Standard Steel Works, Mo. banc., 319 S.W.2d [871] l. c. 875 [2]), for there is scarcely any movement of the human body done in the performance of an occupation which is not duplicated in everyday life, nor any compensable disease not also at some time contracted by the general public.

"We think it implicit in the decisions on occupational disease as judicially defined and explicit in the provisions of Section 287.067, V.A.M.S. (which *Liebrum* acknowledges essentially declares the judicial definition, [Liebrum v. Laclede Gas Co., Mo.App.] 419 S.W.2d [517,] l. c. 521 [1]), that what is distinctively occupational in a particular employment is the peculiar risk or hazard which inheres in the work conditions, and a disease which follows as a natural result of exposure to such occupational risk, an exposure which is greater or different than affects the public generally, is an occupational disease, not an ordinary disease of life."

■ C. We come now to appellants' next argument, to the effect that claimant's bronchiectasis is a result of her own personal susceptibility and therefore, cannot be an occupational disease. In support of this argument appellants rely upon Sanford

v. Valier-Spies Milling Co., Mo.App., 235 S.W.2d 92. That case involved an employee who developed emphysema because of his allergy to wheat dust to which he was exposed in the course of his employment. Compensation was denied in that case on the basis of medical testimony that the employee's emphysema "was attributable to the employee's own individual innate sensitivity" and that the disease "would not have been contracted except for the peculiar susceptibility of the individual worker".

Appellants attempt to bring the instant case within the Sanford ruling, by contending that the claimant here had something in the nature of an allergy which was the predominant cause of her present illness. That contention is not supported by the record. Dr. Lapi, the appellants' own medical witness, denied in his testimony that an allergy can have any effect in the contraction of bronchiectasis or any permanent lung condition, and he did not charge claimant with having any allergy. Dr. MacInnis, appellants' other medical witness, made no finding of any allergy by claimant.

Appellants' entire reliance with respect to this matter of allergy is upon the testimony of Dr. Chernoff, who appeared in support of Mrs. Gaddis' claim. Contrary to appellants' present argument, Dr. Chernoff did not testify to the presence of any allergy on the part of Mrs. Gaddis. In this general description of tests which had been made, Dr. Chernoff did mention a positive histoplasmin test, but he immediately stated that this result was "not medically significant". He also mentioned a slight cobbling of the conjunctiva, but stated that this "is not of itself diagnostic". He also noticed a slight edema of the uvula, but testified that this was of no greater significance than the cobbling of the conjunctiva. Therefore, there is no testimony whatever in this record that Mrs. Gaddis suffered from any pre-existing allergy.

What appellants ultimately clutch on to as a predicate for their argument is the testimony of Dr. Chernoff that Mrs. Gaddis' condition "was caused by two things: By a condition in the patient which allowed her to be susceptible to the second one, which, of course, is the many irritants and poisons she was exposed to". In the context of his entire testimony, that reference by Dr. Chernoff to "a condition in the patient" did not relate to any supposed allergy, but rather, to what Dr. Chernoff had testified about immediately preceding concerning a "recent bronchitis or inflammation of the bronchi". It is a fair reading of Dr. Chernoff's testimony that the import of his testimony was that the bronchitis and inflammation of the bronchi so mentioned related closely in time and causation to the subsequent disabling bronchiectasis. This testimony by Dr. Chernoff was in sharp contrast to that of the appellants' medical testimony, which was to the effect that Mrs. Gaddis' bronchiectasis was of approximately 19 years standing (which would make the bronchiectasis predate employment) and that the bronchiectasis came before, instead of after, the bronchitis. The substantial difference between the expert witnesses therefore related to the date of the onsent of the bronchiectasis.

The Commission chose to believe Dr. Chernoff, as it was entitled to do, as opposed to accepting the version given by the appellants' medical witnesses. The testimony of Dr. Chernoff does not support the conclusion that claimant suffered any allergy or innate sensitivity independent of the working conditions, such as was true in the Sanford case.

II

The final point to be considered is appellants' contention that the facts as found by the Commission do not support the award, for the alleged reason that bronchitis and bronchiectasis are ordinary diseases of life, which were at most aggravated by nonacci-

dental conditions. In support of this argument, appellants cite Liebrum v. Laclede Gas Co., Mo.App., 419 S.W.2d 517, and Bess v. Coca-Cola Bottling Co., Mo.App., 469 S.W.2d 40. The Liebrum case involved a disallowance of compensation where the employee had a heart condition which was aggravated by the inhalation of ammonia fumes in the course of his work. The Bess case refused compensation where an employee's pre-existing tuberculosis was aggravated by dust and fumes incidental to the work.

Those cases are not in point. In both of those situations the employee suffered from an ordinary disease of life, which although aggravated by a condition of employment, nevertheless remained the final cause of disability. In contrast, all the medical testimony in our case is that Mrs. Gaddis, the claimant here, was disabled by bronchiectasis, which under the facts here is an occupational disease. This situation is therefore compensable under the ruling of Fitzgerald v. Fisher Body St. Louis, 234 Mo.App. 269, 139 S.W.2d 975; affirmed in this regard by State ex rel. Fisher Body St. Louis Co. v. Shain, banc, 345 Mo. 962, 137 S.W.2d 546.

Moreover, the prior existing condition in our case (bronchitis) was also an occupational disease. This is specifically so found in the Commission's additional finding No. 4, and such finding was within its province under the evidence. Therefore, the situation here is that both the pre-existing condition and the aggravating condition were occupational diseases; whereas in the Liebrum and Bess cases, the underlying and pre-existing condition was non-occupational in origin and nature.

It is at least interesting to note that there are two Indiana cases under a statute like ours and on facts substantially similar to those here, where awards were affirmed based on bronchiectasis which followed bronchial inflammation caused by industrial dust. Chevrolet Muncie Division of General Motors Corp. v. Hirst, Ind.App.

banc, 113 Ind.App. 181, 46 N.E.2d 281; Schwitzer–Cummins Co. v. Hacker, banc., 123 Ind.App. 674, 112 N.E.2d 221.

The judgment is affirmed.

All concur.