Beverly Sue SKINNER,
Claimant-Appellant,

v.

DAWSON METAL PRODUCTS and
Aetna Casualty & Surety Company,
Employer-Insurer-Respondents.

No. 10474.

Missouri Court of Appeals,
Springfield District.

Dec. 29, 1978.

936

L. R. Magee, Hines & Magee, Kansas City, for claimant-appellant.

Kelly Pool, Hendren & Andrae, Jefferson City, for employer-insurer-respondent.

HOGAN, Presiding Judge.

This is a workmen's compensation case. Beverly Sue Skinner (claimant), a female 29 years of age, made a claim for compensation for injury sustained by accident, a series of accidents or occupational disease arising out of and in the course of her employment. After a hearing, a referee denied an award. Upon appeal, the Labor and Industrial Relations Commission (Commission) reversed the award and allowed compensation as follows: $1,080.00 for temporary total disability; $25.00 for necessary travel and $398.51 for medical treatment rendered by claimant's family physician. The aggregate amount of the award is $1,503.51. On appeal, the Circuit Court of Camden County reversed the Commission on the ground that the employer and insurer received no timely notice of a potentially compensable injury and that the period of limitation prescribed by § 287.430, RSMo (1969), V.A.M.S., had run. Claimant appeals.

The issues presented can best be appreciated by stating some elementary principles. The findings of the referee are

in no wise binding upon the Commission; the Commission reviews the record, determines the credibility of the witnesses and the weight to be given their testimony, resolves any conflicts in the evidence and reaches its own conclusions independently of the referee's findings. *Begey v. Parkhill Trucking Co.*, 546 S.W.2d 529, 532 (Mo.App. 1977); *McAdams v. Seven-Up Bottling Works*, 429 S.W.2d 284, 287 (Mo.App.1968). It is the award of the Commission, not the finding of the referee, which we review, *Michler v. Krey Packing Co.*, 363 Mo. 707, 716, 253 S.W.2d 136, 140 (banc 1952); *McAdams v. Seven-Up Bottling Works*, supra, 429 S.W.2d at 287, and we are required to construe the whole record in the light most favorable to the findings and award of the Commission; when the evidence and inferences are conflicting, resolution rests with the Commission and that resolution is conclusive on the reviewing court. *Bradshaw v. Richardson Trucks, Inc.*, 467 S.W.2d 945, 947 (Mo. banc 1971); *Brown v. Missouri Lumber Transports, Inc.*, 456 S.W.2d 306, 307–308 (Mo.1970). And, as a limitation and restriction upon the scope of this opinion, we may again note that the only issues for consideration on any appeal are those presented in the "points relied on" part of the appellant's brief; questions not there presented are considered abandoned. *Pruellage v. DeSeaton Corporation*, 380 S.W.2d 403, 405 (Mo.1964); *Drysdale v. Cornerstone Bank*, 562 S.W.2d 182, 183 (Mo. App.1978); *MFA Cooperative Ass'n of Ash Grove v. Elliott*, 479 S.W.2d 129, 132–133 (Mo.App.1972).

The claimant's first point is that the trial court erred in reversing the award of the Commission on the ground that the claim was barred by limitation because that finding is contrary to the law and the evidence and the trial court substituted its judgment for that of the Industrial Commission. The employer and insurer respond by contending that the claim was barred by limitation because it was not filed within one year of the date of the alleged occurrence.

In brief sketch, and recited in accord with the general principles stated, the Commission could have found that on June 12, 1972, Dawson Metal Products constructed and supplied air conditioning parts to various purchasers. The claimant was employed as a welder. At the time she sustained her injury, claimant was welding an object identified only as a "bubble for Chrysler." The bubbles were "made funny" so they did not fit properly on a welding table. It was therefore necessary to put the bubble on the table "upside down." The claimant sat on a five-gallon lard can and worked underneath the bubble. Using a torch, sunglasses, a "solder" and "Blue Label" flux,[1] claimant welded copper surfaces of some kind.

The claimant maintained that the ventilation was inadequate. Whether it was or not, the welding process produced noticeable vapors or fumes. The fumes were strong and claimant developed a headache above the bridge of her nose through her forehead up to her hairline. Claimant had not had those particular headaches before. She consulted her family physician, a Dr. Ridgeway, but continued working, welding the copper parts. Claimant thought she ". . . was getting something in [her] eyes." She ". . . thought [she] had got some metal or something" in her right eye. Claimant's left eye was not affected.

On June 15, while she was welding "Chrysler bubbles," claimant lost the sight of her right eye. She informed her foreman, Earnie.[2] Earnie "let [claimant] weld a while longer" and then permitted claimant to inspect parts, but claimant "couldn't see the parts good enough to inspect them." Claimant told Earnie she could not continue because she "simply couldn't see" the parts. Earnie drove the claimant to the claimant's husband's office.

The claimant went directly to see Dr. Ridgeway, her "family doctor." Dr. Ridge-

---

1. The noun "flux" is used here to denote a substance applied to surfaces to be joined by soldering, brazing or welding to clean and free them from oxide and promote their union.

2. Earnie Allen, the foreman, is a female. Counsel refer to her as a "forelady." At the risk of seeming insensitive to E.R.A. enthusiasts, we shall refer to Earnie as the foreman.

way, a board-certified practitioner of family medicine, prescribed an antibiotic, a steroid and a nasal decongestant. Dr. Ridgeway testified that he had seen claimant on May 6. Claimant told him she had been welding; when she welded with a particular compound—"blue flux or whatever"—the compound would irritate her nose and eye. The doctor instructed claimant to change jobs. When Dr. Ridgeway saw claimant on June 10, her complaints were exacerbated; therapy was intensified, but claimant did not immediately respond.

After claimant lost the sight of her right eye, Dr. Ridgeway referred her to a Dr. Prater, a board-certified ophthalmologist. Dr. Prater examined claimant. He found no impairment of visual acuity in claimant's left eye; claimant was limited to the perception of hand motion in her right eye. Dr. Prater found a "large central scotoma" in the right eye, which indicated a loss of vision, primarily in her right eye. The doctor's diagnosis was retrobulbar neuritis of the right eye. The usual treatment for that ailment is oral steroids, which were prescribed. Claimant was improved on June 28. By August 14, claimant showed marked improvement. Dr. Prater did not see the claimant again until 1974.

The claimant returned to work in October 1972. Claimant "had vision enough to return to work but it was never the same as it had been before." Claimant returned to Dawson as a parts inspector and eventually began work as a welder. Claimant welded "Chrysler bubbles" only once after she returned to her employment. Her headaches immediately returned. Claimant left Dawson's employ in 1973. Her testimony, repeated and reiterated, was that she had some loss of vision in her right eye. The Commission found some impairment of claimant's vision before June 12, 1972; found that she had made a good recovery after treatment, and denied an award of compensation for permanent partial disability. Except for medical treatment in the amount of $398.51, and travel expenses in the amount of $25.00, the whole amount awarded represents an allowance for a healing period of 15⁴/₇ weeks at $70.00 per week.

Computation of the award is not challenged; no claim for credit for payments is advanced, and it does not appear that any such claim was made before the Commission. Such, capsulized, are the general background facts as the Commission might have found or fairly inferred them to be.

██ The finding of the Commission upon the first issue tendered is indeed a very general finding, but the Commission is not required to elucidate its reasoning process in the absence of a request to do so, *Scott v. Wheelock Bros.,* 357 Mo. 480, 485, 209 S.W.2d 149, 152 (banc 1948), and contrary to the view taken by the trial court, a general award necessarily implies the finding of every fact necessary to support it, including that of good cause or lack of prejudice under § 287.420, RSMo (1969), V.A.M.S. *Reichert v. Jerry Reece, Inc.,* 504 S.W.2d 182, 188 (Mo.App.1973). Also, with deference to the trial court, we believe it misconstrued the nature of the applicable statute of limitations. We cordially agree that the construction of a statute is a matter of law for a court, but in this instance the statute has been authoritatively construed, and we are firmly held and bound by that construction. In 1943, in *Wentz v. Price Candy Co.,* 352 Mo. 1, 175 S.W.2d 852 (1943), and again in *Welborn v. Southern Equipment Company,* 395 S.W.2d 119 (Mo. banc 1965), our Supreme Court held that § 287.430, RSMo (1969), is merely a statute of repose; the running of the period does not extinguish the remedy and payment made on account of the injury in the form of medical aid may either toll the running of the statutory period or revive the claim and right of action if made after the statutory period has run. *Welborn v. Southern Equipment Company,* supra, 395 S.W.2d 123–125.

This record presents several bases for holding that the employer and insurer had notice of a potentially compensable injury and that the claim was timely filed. We shall discuss two such bases briefly.

██ The precedents cited by the claimant on appeal, e. g., *Smith v. Plaster,* 518

S.W.2d 692 (Mo.App.1975), and *Snow v. Hicks Bros. Chevrolet, Inc.,* 480 S.W.2d 97 (Mo.App.1972), hold, inter alia, that notice of a potentially compensable injury acquired by a supervisory employee is imputable to the employer. Moreover, as this court attempted to make clear in *Smith,* supra, 518 S.W.2d at 699, the employee's recovery of compensation is *not* predicated upon the employer's opinion or persuasion that the injury was compensable, prior to administrative determination. All that is required is actual timely notice or knowledge of a *potentially* compensable injury. *Smith,* supra, 518 S.W.2d at 699.

The record evidence supports a finding that the employer had actual notice and knowledge of a potentially compensable injury. On June 15, or thereabout, claimant lost the sight of her right eye while she was welding or soldering copper. Claimant had not complained immediately after she developed a headache earlier, because she thought she ". . . was getting something in [her] eyes . . . [and] whatever it was . . . would wash . . . out eventually." Nevertheless, claimant testified that Earnie "had been there a long time and . . . knew about the fumes"; claimant and Earnie had discussed the defective ventilation, and when Earnie welded, "she wore a mask a lot of times." The employer and insurer now characterize this testimony as "self-serving" and argue it was not worthy of belief. Their objection on trial was that claimant's testimony about Earnie's knowledge was hearsay; perhaps it was, but the claimant was permitted to answer without a motion to strike, and consequently claimant's conclusions as to what Earnie knew and appreciated were before the Commission for its evaluation. *Ashley v. Williams,* 365 Mo. 286, 293, 281 S.W.2d 875, 880 (1955); *Brown v. Krey Packing Company,* 271 S.W.2d 234, 237[1] (Mo.App. 1954). Moreover, when claimant left the employer's plant on June 15, she had gone blind in one eye while on the job and so informed Earnie. This is considerably different from merely "calling in sick" which is what happened in *Basil v. Cyr,* 130 F.Supp. 642 (W.D.N.Y.1954), cited by the employer and insurer.

The record leaves no doubt about Earnie's supervisory capacity. It is inferable from the testimony of witness Ron Solt, the employer's "comptroller" that Earnie was a "supervisor" and unnumbered exhibits introduced as part of an entire file offered as Employer and Insurer's Exhibit 1 indicate that Earnie supervised claimant's training and progress after she was hired by the employer. Upon the evidence recited, there was a reasonable basis for the Commission's finding that the employer had actual notice of claimant's injury. Conflicting conclusions or inferences may have been permissible, but if so the Commission had a choice, just as it did with the credibility of the witnesses and the weight to be given conflicting testimony. *Shrock v. Wolfe Auto Sales, Inc.,* 358 S.W.2d 812, 815 (Mo. 1962).

Our decision need not rest upon the conclusion that the employer had actual notice of a potentially compensable injury. Claimant testified that a short time after she became blind in her right eye, she made a claim for benefits in the office of a Mr. Citek, the employer's personnel manager. This claim was made under the employer's health insurance plan. The application for benefits was filled in by Mr. Citek, or so the Commission could have found, and claimant signed it. The employer and insurer attach considerable effect to this exhibit, but our inspection of a copy of the application shows only that the question "Was an accident involved"? is answered "No." Claimant testified she told Mr. Citek "I received this injury, what do you do"? Mr. Citek said "You fill out this paper, I will fill it out and you sign it and we [will] get your weekly benefits." Claimant thought she was "supposed to get some like everybody else" because she was "off work." Claimant was aware she was not being paid workmen's compensation. Claimant also testified that she was wholly unfamiliar with the Workmen's Compensation Law. Claimant did tell Mr. Citek she had lost the sight of her eye. Inferably, Citek said nothing about workmen's compensation at any time.

The Commission found as facts that claimant signed the application for benefits, that the application stated her condition was not work-related, but that claimant merely "went along" with the personnel manager's suggestion that she file a claim under the employer's health insurance plan. Our scouring of the record discloses no justification for the finding that claimant's application for benefits stated her injury was not "work-related"; the form was completed by the employer's personnel manager, and claimant and her physicians—Dr. Prater had seen her once—were unsure of the cause of her injury. So, although it is of little consequence to our holding, it may be stated that the record discloses no substantial factual basis for the Commission's conclusion that claimant "stated" or "admitted" that her loss of vision did not arise out of and in the course of her employment.

In any case, the record shows that benefits in the amount of $585.00 were paid to claimant between June 16, 1972, and September 22, 1972. The employer's records do not indicate payment to any person other than claimant. However, claimant testified without objection that Dr. Ridgeway, Dr. Prater and another physician had been paid at least in part before she left Dawson's employ on June 23, 1973. Dr. Prater testified that he saw claimant the last time for treatment on August 14, 1972. It is thus quite plain that the employer's health insurer made payments "on account of the injury" within the meaning of § 287.430, RSMo (1969), well into September 1972. The claim for compensation, which the employer and insurer say was barred by limitation, was filed with the Division of Workmen's Compensation on July 5, 1973. The date of the accident could not reasonably be fixed later than June 15, 1972.

As noted, the applicable statute of limitations is a statute of repose. The statutory period is subject to being tolled, of course, by any payment made on account of the injury. *Reichert v. Jerry Reece, Inc.,* supra, 504 S.W.2d at 189; *Smith v. Home*

*Building Contractors, Inc.,* 363 S.W.2d 11, 15–16 (Mo.App.1962). The rationale of such tolling has been developed lucidly and extensively in *Reichert,* supra, 504 S.W.2d at 188–189, and in *Snow v. Hicks Bros. Chevrolet, Inc.,* supra, 480 S.W.2d at 103–104, cited by claimant, but the idea is not new. Forty-five years ago, when *McFall v. Barton-Mansfield Co.,* 333 Mo. 110, 61 S.W.2d 911 (1933), was decided, the period limited for filing claims was six months. The employer and insurer there raised the bar of limitation, maintaining that the claimant's written claim for compensation had been filed one day late. The employer had paid all or part of a treating physician's bill through an attorney. The court held such payment tolled the running of the statute. Interestingly, in *McFall,* supra, and in *Elsas v. Montgomery Elevator Co.,* 330 Mo. 596, 50 S.W.2d 130 (1932), the employer and insurer advanced the argument that payment should not toll the statute because the payment was not intentionally made as workmen's compensation. In both cases, our Supreme Court held the employer's undisclosed intent was wholly irrelevant. There is nothing in the record before us which compels the conclusion that the employer *intended* to deny liability before its answer was filed, much less that it conveyed any such intent to the claimant. It is fairly inferable that payment to one of the physicians who treated claimant was made after August 14, 1972, and the employer's own records show that payment was made to the claimant as late as September 22, 1972. The written claim for compensation was received in the office of the Division of Workmen's Compensation July 5, 1973. The statute of limitations was tolled by payment on account of the injury, the claim for compensation was timely filed and the employer and insurer's argument that the claim is barred by limitation is wholly without merit.

Most of the transcript before us consists of medical testimony. The employer and insurer's principal argument before the Division of Workmen's Compensation, and ap-

parently before the Commission, was that the evidence demonstrated no correlation between the claimant's employment and the disease which reduced the visual acuity of her right eye. Claimant's argument here, as stated, is that "[T]he award of the Industrial Commission [sic] is supported by competent and substantial evidence in [sic] the whole record and should be reinstated." The employer and insurer's reply is that the award of the Labor and Industrial Relations Commission is not supported by competent evidence and compensation should be denied claimant [because] claimant's sinus condition predated the employment activities upon which her claim is founded.

It is readily inferable from the record that the welding process in which the claimant engaged produced fumes. After she had worked several days welding copper surfaces, using a flux known as "Blue Label Sil Flux," claimant developed sharp headaches which radiated upward from the bridge of her nose to her hairline. A few days later, she became completely blind in her right eye. Her condition was subsequently diagnosed as retrobulbar neuritis. Dr. Prater described this disease in this language:

"Retrobulbar neuritis infers an inflammatory process of some nature that occurs along the optic nerve, that is not visible by looking at the head of the optic nerve on examination so it is made by inference. Since there is a central scotoma in [sic] visual loss the inflammation, therefore, is somewhere behind the eye along the optice nerve before it reaches the brain." [R. 145].

Asked to give the causes of claimant's disease, Dr. Prater responded (emphasis supplied):

"Retrobulbar neuritis is poorly understood and to give you exact causes would be difficult. I think infection or inflammation of any type, particularly in an adjacent structure, which would be a sinus, could be a cause . . . I think that *it also can be caused by toxic agents,* particularly the type that may be taken by mouth. I think there are also several neurological diseases which can cause this retrobulbar neuritis and the most outstanding would be multiple sclerosis."

At the hearing before the referee, the employer and insurer had the testimony of a Dr. Lewin, an ophthalmologist practicing in St. Louis. Dr. Lewin has impressive professional credentials, which the employer and insurer were at some pains to include in the record. Dr. Lewin testified that retrobulbar neuritis can be caused by "many, many different factors" and referred to a standard treatise, which lists two or three pages of causes for the disease. Dr. Lewin was extensively examined and cross-examined; the substance of his testimony was that it was unlikely that the fluoride vapors produced by welding with Blue Label Sil Flux had been the cause of claimant's disease. Dr. Lewin added, several times, that he could not be certain why claimant developed retrobulbar neuritis.

Dr. Ridgeway, claimant's family physician, was more affirmative about the cause of claimant's condition. If we have not, we should have noted that Dr. Ridgeway saw and treated claimant during the time she was suffering from retrobulbar neuritis although he seems to have relied on Dr. Prater for expert advice. In response to a hypothetical question, Dr. Ridgeway gave it as his opinion that the claimant welded with an irritating material and consequently suffered an acute sinusitis with resultant retrobulbar neuritis and loss of vision in the right eye.

■■■■ The Commission found that claimant contracted an occupational disease as a result of exposure to irritant fumes. Seizing upon the language of *Liebrum v. Laclede Gas Company,* 419 S.W.2d 517 (Mo. App.1967), the employer and insurer argue vigorously that both sinusitis and retrobulbar neuritis, are "ordinary diseases of life" and the aggravation of such diseases does not create a compensable occupational dis-

ease. As recognized in *Collins v. Neevel Luggage Manufacturing Company,* 481 S.W.2d 548 (Mo.App.1972) and *Gaddis v. Rudy Patrick Seed Division,* 485 S.W.2d 636 (Mo.App.1972), the terms "ordinary disease of life" and "occupational disease" are not necessarily mutually exclusive, but we do not propose to reexamine the rationale of the decisions distinguishing the two. What the medical evidence vividly demonstrates here is that the etiology [3] of retrobulbar neuritis is obscure. Attribution of claimant's retrobulbar neuritis to the hazards of everyday life or to a risk or hazard inherent in the claimant's work conditions depended, in this case, upon the acceptance or rejection of conflicting medical opinions or theories. Therefore the question whether or not claimant developed an occupational disease was an issue peculiarly for the determination of the Commission. *Vollmar v. Board of Jewish Education,* 287 S.W.2d 868, 872[4] (Mo.1956); *Hawkins v. Nixdorff-Krein Mfg. Co.,* 395 S.W.2d 247, 251 (Mo. App.1965); *Greer v. Missouri State Highway Department,* 362 S.W.2d 773, 778–779[4] (Mo.App.1962). Dr. Ridgeway's opinion constituted substantial and competent evidence that claimant developed an occupational disease. *Greer v. Missouri State Highway Department,* supra, 362 S.W.2d at 779[7].

For the reasons stated, the judgment of the trial court should be reversed and the award of the Labor and Industrial Relations Commission should be reinstated. It is so ordered.

All concur.

---

**3.** The noun "etiology" is used here to mean all of the causes of a disease or abnormal condition.