David **PARSONS**, Appellant,

v.

**STEELMAN TRANSPORTATION, INC.**, Respondent.

No. SD 30485.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 31, 2011.

Motion for Rehearing or Transfer
Denied Feb. 22, 2011.

Application for Transfer Denied
March 29, 2011.

9

Randy Charles Alberhasky, Springfield, MO, for Appellant.

Mary Anne Lindsey, Shari Lockhart, Evans & Dixon, LLC, St. Louis, MO, for Respondent.

ROBERT S. BARNEY, Presiding Judge.

Appellant David Parsons ("Claimant") appeals from the Labor and Industrial Relations Commission's ("the Commission") "Final Award Denying Compensation (Affirming Award and Decision of Administrative Law Judge [ ("ALJ") ] )" from his purported employer, Steelman Transportation ("Steelman"). He asserts three points of Commission error based on the Commission's determination that Claimant was: (1) statutorily exempted, pursuant to section 287.020.1, from coverage under the Workers' Compensation Act ("the Act");[1] (2) that despite having been injured while lifting heavy panels on a trailer owned by Steelman, Claimant was not covered by the Act because he was performing work incidental to his duties as an exempt-from-coverage owner-operator; and (3) that the Commission erred in admitting into evidence a lease-purchase agreement, which Claimant contends was an inadmissible "statement" since it had not been timely provided Claimant pursuant to section

287.215, and without which Steelman could not have proven Claimant was exempt from coverage under the Act. We affirm the decision of the Commission.

The record reveals Claimant, who is an over-the-road truck driver, filed his "Claim for Compensation" with the Division of Worker's Compensation ("the Division") on October 9, 2007, in which he asserted he developed a hernia while working on July 2, 2007, when he "was pulling the panels out of a flatbed trailer." In its "Answer to Claim for Compensation," Steelman denied the allegations in the Claim for Compensation including the fact that Claimant was "in the employ" of Steelman at the time of any alleged injury.

A hearing was held before the ALJ on September 4, 2009. At the hearing certain basic facts were stipulated to by the parties such that the only issues presented for the ALJ's determination were: (1) whether section 287.215 was applicable to the Owner–Operator Contract and Lease Purchase Contract ("the Lease–Purchase Agreement") entered into between Claimant and Steelman; (2) whether Claimant was an employee of Steelman at the time of the accident; (3) whether the accident occurred within the course and scope of his employment; (4) whether Claimant was entitled to Temporary Total Disability or Permanent Partial Disability and, if so, the amount of compensation; and (5) whether Claimant was entitled to reimbursement of $14,527.70 in medical expenses.

Claimant testified at the hearing that he was a married fifty-three-year-old man; that he quit school prior to completing the seventh grade; that he was "[n]ot very good" at reading and writing, but that he could write simple notes and put entries in his log books for work; that he had been a truck driver for twenty years and

1. Unless otherwise stated, all statutory references are to RSMo Cum.Supp.2005.

had been employed by several companies; and that he was "hired" in May of 2007 by Steelman after filling out an application. He related that, after filling out the application, he then attended a three-day orientation where he was presented with various terms, conditions, operating rules, regulations and paperwork which were to govern his work with Steelman. He related that he leased his 2006 Kenworth truck from Steelman;[2] Steelman owned the flat bed trailer that he pulled; his driving assignments were e-mailed to him by Steelman's dispatch operators; he used a credit card provided to him by Steelman to purchase his fuel, but he then had to reimburse Steelman for the cost of the fuel; he checked in with Steelman daily to let it know his location and whether he was going to meet his deadlines; and he would get driving directions e-mailed to him by Steelman, which he was required to follow.

In relation to his operation of the truck[3] he leased from Steelman, Claimant testified he was responsible for paying various taxes on his truck including property taxes, federal taxes, fuel taxes, "highway heavy vehicle use tax," and "state or local axle, weight, mileage ..." taxes. Likewise, he had to pay for ferry, bridge and road tolls as well as any fines or penalties he might accrue on the road. He further stated he maintained a daily log book which detailed the hours he drove as well as his fuel usage and that at the end of each week he sent the logged information to Steelman. During the time he was driving for Steelman, Claimant did not accept driving assignments from any other trucking companies.

Regarding the accident in question, Claimant testified that he picked up a load of copper in Illinois and that the load was already "tarped down and ready to go" when he arrived to pick it up. He stated he proceeded to drop off portions of his load at two other locations and then he made his way to Portland, Oregon. He stated that upon arriving in Portland he parked his truck and was standing on the flat bed trailer removing the "seventy to [eighty] pound[ ]" "5 foot long, 4 foot tall" "3/4 inch plywood and 2 by 4[']s," which act as the side panels of the trailer, when he grabbed a panel and his body "twisted." He stated that, thereafter, his "stomach started hurting real bad" and, once he got help unloading his trailer, he telephoned Steelman's dispatcher to inform Steelman that he had injured himself. He was then routed by his dispatcher so that he could make his way back home. When he arrived in Springfield, he went to Steelman's office, showed his dispatcher his stomach, was told to go to a physician, and was told to "bill it to workmen's comp."[4] Claimant saw two separate physicians, who diagnosed him with a hernia, and several

---

**2.** Claimant testified Steelman deducted $427.00 per week from his paycheck to go toward the lease on his truck. Steelman also paid from his paycheck license and permit fees, "Qualcomm charges" for the use of his on-board computer, truck insurance, occupational accident insurance, "base plates," and supplies such as binders and tarps.

**3.** We note that the terms "[t]ractor and truck are used interchangeably to describe the vehicle driven by a truck driver." *Nunn v. C.C. Midwest*, 151 S.W.3d 388, 393 n. 2 (Mo.App. 2004).

**4.** At the hearing, Claimant testified that portions of his medical bills were paid by "insurance" but he was not sure if that was some sort of worker's compensation policy provided by Steelman or himself or whether it was his occupational accident insurance which he was required to carry by Steelman. He later identified many of the medical bills as having been paid via his occupational accident policy and/or by Medicaid.

weeks after the accident he had surgery to repair his hernia. He stated that following the accident and his subsequent surgery he did not return to truck driving nor has he been able to return to gainful employment. At the time of the hearing, he was apparently on "disability;" was restricted to lifting only fifteen pounds at a time; and still suffered from abdominal pain.

James Towery ("Mr. Towery"), the president and owner of Steelman, testified his company was an interstate common carrier and had been in the business of hauling the goods of other companies for eleven years. He related his company had "48 state authority" such that it could pick up in one state and deliver in another state. He stated that the only employees of Steelman were those involved in the office and operations as well as mechanics in the garage, "people in the yard," and three drivers that operate just within the city. He related the people that operate the trucks were owner-operators and by federal law they were only able to drive for one company at a time. He stated the owner-operators "are expected to stay out in their trucks" for "ten days to two weeks away from their home;" are "responsible for all their costs of operating their truck;" are able to determine the best way to get to and from load pick-ups and drop-offs; are "paid by the mile plus a fuel surcharge supplement;" and are paid for stops and "piece work." Mr. Towery stated that "in other words, [Steelman] pay[s] the truck, and then the driver's responsible for the operation of that truck: the cost of the oil, the fuel, the tolls, the tires, the brakes. And then [the driver], as his small business, he has whatever's left over from running his business." He also related the

trailers used by Steelman were specific to it so it maintained control of the trailers and merely provided them to the drivers for their use. Further, Mr. Towery testified that Steelman did not pay any workers' compensation insurance on the owner-operator truck drivers; only on its employees. He stated the owner-operators are "paid a gross amount and paid on a 1099 form, and taxes are not withheld." Mr. Towery also related that once a driver filled out an application with Steelman and it was determined that the driver met the qualifications, then that person was invited to orientation where the driver would be provided with the following documents: a list of "general requirements for the truck driving position ...;" pay package information; "TripPak" information which is "how they would submit their paperwork each week" as well as information on the log sheets required by the United States Department of Transportation ("US DOT"); the "Owner Operator Handbook" which contained "rules and regulations that are required by ... the Federal Motor Carriers Safety Administration;" and a driver qualification document required by the U.S. DOT. If the driver did not have a truck, the driver was then given the option of leasing a truck from Steelman and Steelman would give the driver a choice of trucks and corresponding lease rates.

Mr. Towery testified that he personally sat down with every driver and went over the various contracts with the driver prior to the signing of the contracts, and even highlighted specific portions of the documents that he felt were significant. He stated that he sat down with Claimant and went over Steelman's "Independent Contractor Operating Agreement" [5] as well as

5. Attached to the Independent Contractor Operating Agreement were the following documents: a "receipt for possession of contracted equipment;" an attachment entitled "Contrac-

tor Compensation;" an attachment entitled "charge-backs and other deductions;" an attachment relating to "Insurance;" a completed "Certificate of Insurance;" an attachment

the Lease–Purchase Agreement relating to the truck. He stated it typically took about an hour to go over the documents, and that at the end of the discussion Claimant signed the contracts. He related that in addition to Claimant signing the Lease–Purchase Agreement, which set out that Claimant as a driver had leased a truck, thus, he had a truck to offer to Steelman, Claimant signed a "receipt for possession of contracted equipment" which effectively leased the truck from Claimant back to Steelman. Mr. Towery testified that the receipt showed that Steelman was accepting the vehicle from Claimant and that Steelman was responsible for the vehicle complying with all the various U.S. DOT rules and regulations. He explained that certain federal regulations required Steelman "to have control of the vehicle at all times; that [Steelman] have it insured; that [Steelman] have it lettered; that [the truck is] properly numbered; proper insurance forms; and proper authorities are inside the truck at all times." He stated that even if Claimant had not leased a vehicle from Steelman and, instead, already had a vehicle, he would still have had to complete these forms. Further, Mr. Towery stated the contracts indicated that Claimant did not choose to carry workers' compensation insurance on himself and, instead, chose occupational accident insurance. He stated after Claimant was injured he had difficulty with the occupational accident company and Mr. Towery had him work with Steelman's safety director "to try and help him get his claim pushed through...." He also related that Claimant's policy had "a specified benefit for a hernia of $10,000.00."

On October 1, 2009, the ALJ issued its "Final Award." The ALJ concluded that the various contracts in this matter "identif[ied] Claimant as an independent contractor" and that those contracts did not fall within the purview of section 287.215 because that statute referred to a statement in "writing made or given by an injured employee" and the contracts between Claimant and Steelman were entered into well before Claimant was injured. Further, the ALJ found that pursuant to sections 287.020.1 and 301.010(43) Claimant was not an employee of Steelman despite Claimant's argument that "he was injured while working with the *trailer*, not while driving the truck." The ALJ also found that Claimant was an owner-operator providing services to a for-hire motor carrier which operated within a commercial zone or under a certificate. *See* § 287.020.1. The ALJ noted Claimant's argument that he "had no ownership interest in the *trailer*, and thus [he] cannot be an owner-operator of the trailer," but the ALJ found that there was no legislative intent "to allow Claimant to vacillate between his status as an independent contractor and that of an employee. Claimant was injured while performing work incidental to his duties as an owner-operator." Accordingly, the ALJ found that because Claimant was not an employee of Steelman, he was not entitled to benefits and there was no reason to decide any of the remaining issues before the ALJ. On October 16, 2009, Claimant filed his Application for Review with the Commission. Thereafter, on March 23, 2010, the Commission issued its final award in which it

entitled "Performance Reserve Escrow Fund;" an attachment entitled "Carrier Policies and Procedures;" an attachment relating to "Communications Equipment;" a completed "Satellite Communications System Receipt;" an attachment entitled "Securement

Equipment Purchase/Loan Contract;" an attachment relating to "Base Plates, Permits, and Fuel Tax Reporting;" a "Statement of Lease;" and loan documentation. All of these documents were signed by Claimant.

affirmed and adopted the decision of the ALJ. This appeal by Claimant followed.

■ " 'In reviewing a workers' compensation award, we review the findings of the Commission and not those of the ALJ.'" *Clayton v. Langco Tool & Plastics, Inc.,* 221 S.W.3d 490, 491 (Mo.App.2007) (quoting *Banks v. Springfield Park Care Center,* 981 S.W.2d 161, 163 (Mo.App.1998)). "Where, as here, the Commission's award attached and incorporated the ALJ's award and decision, we consider the findings and conclusions of the Commission as including the ALJ's award." *Id.*

■ "The Missouri Constitution, article V, section 18, directs this Court to determine whether the Commission's award is 'supported by competent and substantial evidence upon the whole record.'" *Ahern v. P & H, LLC,* 254 S.W.3d 129, 132 (Mo.App.2008) (quoting *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222 (Mo. banc 2003) [6]). Upon review, an appellate court may modify, reverse, remand for rehearing, or set aside the award of the Commission only if it determines that the Commission acted in excess of its powers, the award was procured by fraud, the facts found by the Commission do not support the award, or there was not sufficient competent evidence in the record to warrant making the award. *Hampton,* 121 S.W.3d at 222–23. We examine the whole record in order to determine whether there is sufficient competent and substantial evidence to support the award. *Id.* at 223. "[W]e must determine whether the Commission reasonably could have made its findings and reached its result based upon all of the evidence before it." *Fitzwater v. Dept. of Public Safety,* 198 S.W.3d 623, 627 (Mo.App.2006). "However, 'we defer to the Commission on issues involving the credibility of witnesses and the weight to be given testimony, and we acknowledge that the Commission may decide a case upon its disbelief of uncontradicted and unimpeached testimony.'" *Hurn v. Schoen Equip., Inc.,* 253 S.W.3d 587, 589 (Mo.App.2008) (quoting *Alexander v. D.L. Sitton Motor Lines,* 851 S.W.2d 525, 527 (Mo. banc 1993)).

For the sake of clarity, we shall analyze Claimant's third and first points relied on out of order.

■ In his third point relied on, Claimant argues the Commission erred in admitting into evidence the Lease–Purchase Agreement and in "relying upon it as a basis for finding [Claimant] to be an owner ... under [section] 287.020.1 because [the Lease–Purchase Agreement was] an inadmissible 'statement' under ... [section] 287.215." He asserts such reliance on the Lease Purchase Agreement was improper as "it was not timely provided to [Claimant], so that any 'use or reference' to the Lease–Purchase Agreement should have been excluded from evidence and there lacked sufficient credible evidence to hold that [Claimant] was an 'owner' under ... [section] 287.020.1."

■ "The Missouri Workers' Compensation Law 'is entirely a creature of statute.'" *Richard v. Missouri Dept. of Corrections,* 162 S.W.3d 35, 39 (Mo.App. 2005) (quoting *Simpson v. Saunchegrow Constr.,* 965 S.W.2d 899, 903 (Mo.App. 1998)). "This [C]ourt is guided by the general rules of statutory construction in interpreting it." *Id.* "To discern the meaning of section 287.215, its intent and its purpose must be examined. Legislative

---

**6.** We note several cases overruled by *Hampton,* to the extent they are in conflict with the holding therein, are cited in this opinion in support of other principles of law not affected by the *Hampton* ruling. *Id.* at 224–32. No further acknowledgment of *Hampton*'s effect on those cases needs to be recited hereafter.

intent is derived from the statute's words 'used in their plain and ordinary meaning.'" *Fisher v. Waste Mgmt. of Missouri*, 58 S.W.3d 523, 526 (Mo. banc 2001) (quoting *Budding v. SSM Healthcare Sys.*, 19 S.W.3d 678, 680 (Mo. banc 2000)). "Where the language of a statute is unambiguous and clear, this [C]ourt will give effect to the language as written, and will not engage in statutory construction." *Bolen v. Orchard Farm R–V School Dist.*, 291 S.W.3d 747, 751 (Mo.App.2009).

> We presume that the legislature intended that each word, clause, sentence, and provision of a statute have effect and should be given meaning. In determining the intent and meaning of statutory language, the words must be considered in context and sections of the statutes in *pari materia*, as well as cognate sections, must be considered in order to arrive at the true meaning and scope of the words.

*Id.* (internal citation omitted). "To discern the statute's purpose, its context with the over-all scheme established by the legislature for adjudicating workers' compensation claims is considered." *Fisher*, 58 S.W.3d at 526.

Section 287.215 sets out in full:

> [n]o statement in writing made or given by an *injured* employee, whether taken and transcribed by a stenographer, signed or unsigned by the injured employee, or any statement which is mechanically or electronically recorded, or taken in writing by another person, or otherwise preserved, shall be admissible in evidence, used or referred to in any manner at any hearing or action to recover benefits under this law unless a copy thereof is given or furnished the employee, or his dependents in case of death, or their attorney, within thirty days after written request for it by the injured employee, his dependents in case

of death, or by their attorney. The request shall be directed to the employer or its insurer by certified mail. The term 'statement' as used in this section shall not include a videotape, motion picture, or visual reproduction of an image of an employee.

(Emphasis added.) Under the "'plain and ordinary meaning'" of this section, *Fisher*, 58 S.W.3d at 526 (quoting *Budding*, 19 S.W.3d at 680), it is clear that it refers to a "statement in writing made or given by an *injured* employee ...." § 287.215 (emphasis added). In other words, to constitute a "statement" an employee must first have sustained an injury whether by accident or occupational disease. Indeed, had the legislature intended that all statements made by any employee, whether before or after a work related injury, be disclosed, the legislature would have employed the term "employee" rather than the more specific phrase "injured employee." As Steelman argues in its brief, to construe section 287.215 in the manner suggested by Claimant would result in reading the term "injured" out of that statutory provision. This we cannot do. As previously related, "[w]e presume that the legislature intended that each word, clause, sentence, and provision of a statute have effect and should be given meaning." *Bolen*, 291 S.W.3d at 751; *see State ex rel. BP Products North America v. Ross*, 163 S.W.3d 922, 927 (Mo. banc 2005). Accordingly, it is clear that Claimant executed the Independent Contractor Operating Agreement and Lease–Purchase Agreement prior to his injury in July of 2007; hence, these contractual agreements could not have constituted a writing made or given by an injured employee within the contemplation of section 287.215 since at the time of their execution Claimant was not yet injured. Furthermore, if, as the Supreme Court of Missouri has stated, the "statute seems designed to avoid surprises ...," *Fisher*,

58 S.W.3d at 527, this Court fails to see how Claimant was surprised by Mr. Towery's testimony and the evidence produced at trial relating to either the Independent Contractor Operating Agreement or Lease–Purchase Agreement in that Claimant had theretofore undertaken to carry out the provisions of these documents and had, in fact, signed them. Point III is denied.

█ Now, in his first point relied on, Claimant maintains the Commission erred in:

denying [his] claim pursuant to ... section 287.020.1 on the grounds that [Claimant] was an 'Owner–Operator' because at the time the accident occurred [Claimant] was not an 'Owner' of the trailer on which he was injured, was not an 'operator' of the tractor and was not 'operating' the truck, in that the trailer was owned by [Steelman and Claimant] was not in the tractor when injured and the tractor was parked and inoperative at the time of the injury.

We note that Claimant signed the Independent Contractor Operating Agreement at the time he began working for Steelman and, thereafter, was treated by Steelman as an independent contractor and as an owner-operator of his motor vehicle subject to the requirements mandated by federal rules and regulations. It matters not whether he was injured while in the motor vehicle itself or on the trailer. This is because Claimant's argument ignores the fact that the truck and attached trailer were intended to operate as a single unit. In other words, the truck, alone, could not haul freight and goods as Claimant had contracted to do for Steelman. Furthermore, as stated by the Commission, Claimant cannot "vacillate between his status as an independent contractor and that of an employee.... *Claimant was injured while performing work incidental to his duties*

*as an owner-operator.* As such, he was not an employee, and not entitled to benefits from [Steelman]." (Emphasis added.) We agree with the reasoning of the Commission and it is supported by substantial evidence. Point I is denied.

█ In his second point relied on, Claimant asserts the Commission erred in denying his claim pursuant to section 287.020.1 and in finding pursuant to section 390.020, RSMo Cum.Supp.2004, that Steelman "was a 'for-hire motor carrier operating within a commercial zone ... or operating under a certificate issued by the Missouri Department of Transportation [ ("MO DOT") ] or by [US DOT], or any of its subagencies....' " Claimant maintains the accident did not occur while Claimant was in a commercial zone because the accident occurred outside the State of Missouri. Further, Claimant argues there was no evidence Steelman had a Missouri or Federal certificate at the time of the accident in that Steelman "failed to produce a certificate into evidence" and the testimony at the hearing "was vague, speculative and too meaningless for the Commission to rely upon as substantial credible evidence...."

Section 287.020.1 states

[t]he word 'employee' as used in this chapter shall be construed to mean every person in the service of any employer, as defined in this chapter, under any contract of hire, express or implied, oral or written, or under any appointment or election, including executive officers of corporations.... The word 'employee' shall not include an individual who is the *owner,* as defined in subsection 43 of section 301.010 ... and *operator of a motor vehicle* which is *leased or contracted with a driver* to a *for-hire motor carrier* operating *within a commercial zone* as defined in section 390.020 or 390.041 ... *or operating under a certifi-*

cate issued by the Missouri department of transportation or by the United States Department of Transportation, or any of its subagencies.[7]

(Emphasis added.) Accordingly, this definition contains four requirements to prove one is outside of the designation of being considered an employee under the Act: 1) the person must be an owner of a motor vehicle; 2) the person must be an operator of a motor vehicle; 3) the motor vehicle must be "leased or contracted with a driver to a for-hire motor carrier;" and 4) the for-hire motor carrier must have been "operating within a commercial zone" or "under a certificate issued by [MO DOT] or by U.S. DOT, or any of its subagencies." *Id.*

First, we examine whether Claimant was an "owner" of a motor vehicle. Section 301.010(43) defines an "owner" as

any person, firm, corporation or association, who holds the legal title to a vehicle or in the event a vehicle is the subject of an agreement for the conditional sale or lease thereof with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee, or in the

event a mortgagor of a vehicle is entitled to possession, then such conditional vendee or lessee or mortgagor shall be deemed the owner for the purpose of this law. . . .

Here, there was testimony and evidence from both Steelman and Claimant that Claimant leased the truck from Steelman and that lease payments were automatically deducted from his weekly pay. The Lease–Purchase Agreement established that when Claimant paid his indebtedness on the truck to Steelman, the truck would then be titled in his name. Claimant was able to select the truck he wanted to lease; no other persons ever operated that vehicle other than Claimant; and Claimant only operated that vehicle in conjunction with working for Steelman. Claimant was also responsible for all of the maintenance, operating expenses, fuel expenditures, permitting, and other associated expenses in relation to the operation and use of the truck he leased from Steelman. Claimant was an owner per section 301.010(43).

■ Second, we examine whether Claimant was an operator of a motor vehicle. Section 301.010(42) defines an "operator" as "any person who operates or

---

7. There are several other statutory provisions which deal with this "employee" definition as it relates to owners and operators of motor vehicles. For example, section 287.040.4 states that its provisions relating to statutory employment and entitlement to worker's compensation benefits

> shall not apply to the relationship between a for-hire motor carrier operating within a commercial zone as defined in section 390.020 or 390.041, . . . or operating under a certificate issued by [MO DOT] or by [US DOT], or any of its subagencies, and an owner, as defined in subdivision (43) of section 301.010 . . . and operator of a motor vehicle.

Likewise, section 287.041 provides that

> [n]otwithstanding any provision of sections 287.030 and 287.040, for purposes of this law, in no event shall a for-hire motor carri-

er operating within a commercial zone . . . or operating under a certificate issued by [MO DOT] or by [US DOT], or its subagencies, be determined to be the employer of a lessor. . . .

Additionally, section 287.043 specifically abrogated certain prior cases dealing with the definition of "owner:"

> [i]n applying the provisions of subsection 1 of section 287.020 and subsection 4 of section 287.040, it is the intent of the legislature to reject and abrogate earlier case law interpretations on the meaning of or definition of 'owner', as extended in the following cases: *Owner Operator Independent Drivers Ass'n., Inc. v. New Prime, Inc.*, 133 S.W.3d 162 (Mo.App. S.D., 2004); *Nunn v. C.C. Midwest*, 151 S.W.3d 388 (Mo.App. W.D. 2004).

drives a motor vehicle...." Claimant testified repeatedly about operating the 2006 Kenworth truck which he leased from Steelman on his various hauls across the country. There is no doubt Claimant was an operator per section 301.010(42).

■ Third, we explore whether the motor vehicle was "leased or contracted with a driver to a for-hire motor carrier ...." § 287.020.1. Mr. Towery testified without objection about the process by which the motor vehicle was leased by Claimant so as to comply with federal regulations.[8] The record shows that Claimant was the assigned driver of that vehicle, that he and he alone operated the vehicle, and that he did so only while hauling loads for Steelman.

Additionally, there was evidence that Steelman was a "for-hire carrier."[9] In addition to the foregoing testimony relating to requirements mandated by federal and state transportation authorities, Mr. Towery testified without objection that Steelman "is a[n] interstate common carri-

er, flat bed and specialized hauler," and that it has "48 state authority, and can operate in all 48 states." Furthermore, Mr. Towery acknowledged Steelman carried freight to various businesses in the 48 states and had done so for the past eleven plus years. He also testified that Steelman "generally pick[s] up in one state and deliver[s] in another state." Claimant made no motion to strike the foregoing testimony and these statements "were before the Commission for its evaluation." *Skinner v. Dawson Metal Products*, 575 S.W.2d 935, 940 (Mo.App.1978). We defer to the Commission on issues involving the credibility of witnesses and the weight to be given testimony. *Hurn*, 253 S.W.3d at 589. Here, it is clear that the motor vehicle in question was "leased or contracted with a driver to [Steelman], a for-hire motor carrier ...." § 287.020.1.

■ Fourth, we determine if Steelman was "operating within a commercial zone"[10] or "under a certificate issued by

8. Mr. Towery explained that the
   Statement of Lease is one page that the federal regulations require ... that [Steelman] can put into [Claimant's] permit book inside the truck that says ...—this truck is leased to [Steelman] by [Claimant], and [Claimant] doesn't have to show a DOT officer this complete lease contract. That statement of lease is sufficient to—for 49 CFR 376.2.
   Mr. Towery also related Steelman issued Claimant an "Owner Operator Handbook." He stated "[i]t's a book about [a] half inch thick of rules and regulations that are required by ... the Federal Motor Carriers Safety Administration, DOT, [Steelman] and [Steelman's] insurance company." When asked if the log book rules in the handbook were something for Steelman or something that the government required, Mr. Towery responded, "[t]hose are DOT regulations." As for "safety information" being a DOT requirement, Mr. Towery responded that "[a] lot of the safety [requirements] [were] a mixture of state rules, federal rules and [Steelman's] rules." Lastly, when asked why Steel-

man had "to be strict on these policies," Mr. Towery responded that Steelman is "investigated by the Federal DOT and the State DOT. [Steelman is] actually in a pilot program for the CSA 2010, which [is] a safety action that they want [Steelman] to concentrate on speeding or on log book enforcement."

9. As it pertains to the State of Missouri, section 390.020(6), RSMo Cum.Supp.2004, defines a "[c]ommon carrier" as "any person which holds itself out to the general public to engage in the transportation by motor vehicle of passengers or property *for hire* or compensation upon the public highways and airlines engaged in intrastate commerce." (Emphasis added.) There is a largely equivalent definition relating to a common carrier involved in interstate commerce. *See State ex rel. Public Serv. Comm'n v. Logan*, 411 S.W.2d 86, 88–89 (Mo.1967).

10. Section 390.020(4), RSMo Cum.Supp. 2004, contains the following definition of "commercial zone" as pertains to the State of Missouri:

[MO DOT] or by [US DOT], or any of its subagencies." § 287.020.1. While the ALJ sustained Claimant's objection to the exhibits purporting to show both MO DOT and U.S. DOT certification to operate as a common carrier in both intrastate and interstate commerce due to lack of authentication,[11] nevertheless, Mr. Towery offered all of the foregoing testimony without objection by Claimant that Steelman had been in business for eleven years as an "interstate common carrier" operating "in all 48 states." [12] "[W]here no objection is made, hearsay testimony may be considered and, in fact, all probative evidence received without objection in a contested case must be considered in administrative hearings." [13] *Clark v. FAG Bearings Corp.*, 134 S.W.3d 730, 737 (Mo.App.2004). Furthermore, we are cognizant of section 287.550, which sets out that "all proceedings before the [Commission] shall be simple, informal and summary, and without regard to the technical rules of evidence." "Under the ... Act, substantial rights are to be enforced at the sacrifice of procedural rights." *Hale v. Treasurer of Missouri*

*as Custodian of Second Injury Fund,* 164 S.W.3d 184, 186–87 (Mo.App.2005) (internal citation omitted). Accordingly, we determine there was substantial evidence supporting the Commission's determination that Steelman was at the very least operating "under a certificate issued by [MO DOT] *or* by [US DOT] or any of its subagencies." § 287.020.1 (emphasis added). Based on the foregoing, we cannot agree with Claimant that Mr. Towery's testimony that Steelman had the power to operate under a certificate of authority "was vague, speculative and too meaningless for the Commission to rely upon as substantial credible evidence ..." despite the exclusion of the tendered certificates of authorization. Accordingly, we determine that at the time of his accident Claimant was an owner-operator and not an employee of Steelman such that he was exempted from the Act based on section 287.020.1. "[T]he Commission reasonably could have made its findings and reached its result based upon all of the evidence before it." *Fitzwater,* 198 S.W.3d at 627. There was competent and substantial evidence to sup-

unless otherwise increased pursuant to the provisions of subdivision (4) of section 390.041, any municipality within this state together with that territory either within or without the State of Missouri, extending one mile beyond the corporate limits of such municipality and one additional mile for each fifty thousand inhabitants or portion thereof; however, any commercial zone of a city not within a county shall extend eighteen miles beyond that city's corporate limits and shall also extend throughout any first class charter county which adjoins that zone. . . .

11. "A number of foundational requirements must be met before a document may be received into evidence, including relevancy, authentication, the best evidence rule, and hearsay." *Ozark Appraisal Service, Inc. v. Neale,* 67 S.W.3d 759, 766 (Mo.App.2002). Here, Claimant made no objections during the hearing as to the best evidence rule or relevancy. It should be noted that "rules and regulations promulgated pursuant to federal statutes may

be judicially noticed and considered as evidence." *Giddens v. Kansas City S. Ry. Co.,* 29 S.W.3d 813, 821 (Mo. banc 2000); *see also Kawin v. Chrysler Corp.,* 636 S.W.2d 40, 44 (Mo. banc 1982). Furthermore, it has been held that the "courts of this state shall take judicial notice, without proof, of the contents of the code of state regulations." *Gray v. White,* 26 S.W.3d 806, 816 (Mo.App.1999).

12. It is of note that the content and substance of these certificates was not in issue in this case. The issue was whether Steelman, indeed, was operating under these certificates.

13. "The rules of the Department of Labor and Industrial Relations, in particular, 8 CSR 50–2.010(14) provide ... '[h]earings before the [D]ivision shall be simple informal proceedings. The rules of evidence for civil cases in the state of Missouri shall apply.'" *Id.* at 736, n. 5.

port the award of the Commission. *See Hampton*, 121 S.W.3d at 222. Point II is denied.

The award of the Commission is affirmed.

BURRELL and FRANCIS, JJ., CONCUR.